Argued March 4; affirmed April 14, 1936

# JORY *v.* MARTIN ET AL.

(56 P. (2d) 1193)

*Rodney W. Alden,* of Woodburn, for appellant.

*Ralph E. Moody,* Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondents.

RAND, J. Plaintiff, a taxpayer and resident of this state, brought this suit to enjoin the Honorable Charles H. Martin from receiving or being paid for his services as governor of Oregon any sum in excess of $1,500 per year and also to enjoin the secretary of state from issuing and the state treasurer from paying any warrants in favor of the governor which, in the aggregate, shall exceed that sum during any one year.

Defendants demurred to the complaint upon the grounds, first, that it failed to state facts sufficient to constitute a cause of suit, and, second, that the plaintiff had no legal capacity to sue. The trial court sustained the demurrer and dismissed the suit, and plaintiff has appealed.

Section 67-601, Oregon Code 1930, provides that the governor shall receive an annual salary of $7,500. Plaintiff contends that this section contravenes section 1 of Article XIII of the state constitution which provides:

"The governor shall receive an annual salary of fifteen hundred dollars. The secretary of state shall receive an annual salary of fifteen hundred dollars. The treasurer of state shall receive an annual salary of eight hundred dollars. The judges of the supreme

court shall each receive an annual salary of two thousand dollars. They shall receive no fees or perquisites whatever for the performance of any duties connected with their respective offices; and the compensation of officers, if not fixed by this constitution, shall be provided by law."

In support of his contention that section 67-601 is unconstitutional, plaintiff says that the language employed in the above provision of the constitution is plain and free from all ambiguity and, therefore, that it was not within the power of the legislature to increase the salary of the governor over and above the sum specified and, for that reason, the demurrer was improperly sustained, while the defendants contend that the framers of the constitution and the people in adopting it intended to fix the sum specified as minimum sums only and did not intend to take from the legislature the power to increase the salaries of any of the officers so mentioned, whenever, in its discretion, it was deemed proper to do so. Their argument is that, since no negative words were used in this section of the constitution and no express prohibition is contained in it, limiting the power of the legislature to increase the compensation of said officers, the matter of providing for future increases in such salaries was intended to be left to the discretion of the legislature and not to be fixed irrevocably by the constitution.

Before considering these contentions, it is proper to state that this provision if intended to constitute any limitation upon the powers of the legislature to increase such salaries, was a part of the constitution as originally adopted by the people at an election held on November 9, 1857, and has never been amended except as to the salaries of the justices of the supreme court,

which, by section 1 of Article VII, adopted on November 8, 1910, were taken out of the operation of the above section and were thereafter expressly made to be such as may be provided by law.

To sustain their contention, defendants call attention to the many provisions of the constitution in which words of negation or express prohibition are used to limit the powers of the legislature and particularly to section 29 of Article IV and section 10 of Article VII of the constitution. The first section, in part provides:

"The members of the legislative assembly shall receive for their services a sum not exceeding $3 a day, from the commencement of the session; but such pay shall not exceed in the aggregate $120 for per diem allowance for any one session. When convened in extra session by the governor, they shall receive $3 per day; but no extra session shall continue for a longer period than 20 days. * * *"

The last provision provides:

"When the white population of the state shall amount to two hundred thousand, the legislative assembly may provide for the election of supreme and circuit judges in distinct classes, one of which classes shall consist of three justices of the supreme court, who shall not perform circuit duty," etc.

Because of the express prohibition contained in the provision first above quoted that the compensation of the members of the legislative assembly shall not exceed $3 a day, it was held in *Jones v. Hoss,* 132 Or. 175 (285 P. 205), that the legislature had no power to increase the compensation of its members above the amount specified in the constitution, while in *State v. Cochran,* 55 Or. 157 (104 P. 419, 105 P. 884), it was held that section 10 of Article VII, which provided that "one

of which classes shall consist of three justices of the supreme court'', did not limit the power of the legislature to increase the number of justices of the supreme court to more than three. The defendants cite the case last cited as an authority to support their contention that, since there are no negative words or express prohibition contained in section 1 of Article XIII, as were employed in section 29 of Article IV, that there was no intention upon the part of the framers of the constitution and the people in adopting it to limit the powers of the legislature to increase the salaries of the officers named therein. The reason, of course, for the express prohibition in the one case and not in the other, although not destroying the force or effect of defendants' argument, obviously is that, in the absence of such prohibition, the legislature, by its own action alone, could increase the compensation of its members to any amount desired, while no increase could be obtained in the salaries of the officers mentioned in section 1 of Article XIII, except by legislative enactment.

It must be borne in mind that the convention which framed the constitution was convened on August 17, 1857, and adjourned thirty-two days thereafter and that the constitution was adopted by the people at an election held on November 9, 1857, and went into effect on February 14, 1859, upon the admission of the state into the Union, and that at the time of its admission, the state had a population of only 53,000.

It must also be remembered that the framers of the constitution were far-seeing men who must have visioned that there would be a great future increase in the population of this state and that the time would soon come when these salaries would be wholly in-

sufficient to compensate the governor, secretary of state, state treasurer and the justices of the supreme court for their services. The framers knew that the duties and responsibilities of these officers would be increased in proportion to the increase in population and the development of the state and, knowing this, it is reasonable to suppose that had the framers intended to take away from the legislature the power to increase these salaries and to make their increase impossible except by an amendment of the constitution, they would have said so in plain and unmistakable language and not have left the matter in doubt.

■ It must also be remembered that some of the ablest lawyers of their time were members of the convention and knew the importance and necessity of limiting the power of the legislature by the use of negative words, and this is shown in numerous provisions of the constitution, as will be seen from an examination thereof. It must also be borne in mind that the framers of the constitution and the people in adopting it, without expressly providing that these salaries should not be increased, were not dealing with any question involving the fundamental rights or liberties of the people or any essential attribute of state government, but were dealing with a matter that, upon changed conditions, would be peculiarly within the discretion of the legislature and, hence, there is no presumption that these salary provisions, which are matters of temporary concern only, could not be changed without an amendment of the constitution.

■ We must also remember that our constitution, like all other state constitutions is not to be regarded as a grant of power but rather as a limitation upon the

powers of the legislature and that the people, in adopting it, committed to the legislature the whole law-making power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature, for all purposes of civil government, is the rule, and a prohibition to exercise a particular power is an exception. It, therefore, is competent for the legislature to enact any law not forbidden by the constitution or delegated to the federal government or prohibited by the constitution of the United States. *State ex rel. v. Steele,* 39 Or. 419 (65 P. 515); *Rockhill v. Benson,* 97 Or. 176 (191 P. 497); *Eastern & Western Lumber Co. v. Patterson,* 124 Or. 112 (258 P. 193, 264 P. 441, 60 A. L. R. 528); *Latourette v. Clackamas County,* 131 Or. 168 (281 P. 182); *Loe v. Britting,* 132 Or. 572 (287 P. 74); *People v. Draper,* 15 N. Y. 532, 543; Cooley, Const. Lim. (8th Ed.), page 176.

In *David v. Portland Water Committee,* 14 Or. 98, 109 (12 P. 174), Mr. Justice Thayer, speaking for the court, said:

"* * * The people of this state possessed originally all legislative power, subject to the restrictions contained in the constitution of the United States, and they have invested the legislative assembly with that power to the fullest extent, except so far as they expressly inhibited its exercise, as before suggested. The question in such cases is not as to the extent of power that has been delegated by the people to the legislative assembly, but as to the limitations they have imposed upon that body."

In *Cresap v. Gray,* 10 Or. 345, 349, Mr. Justice Lord stated the rule as follows:

"* * * An act of a state legislature, not prohibited by the express words of the constitution, or by necessary implication, cannot be declared void as a violation of that instrument."

Mr. Chief Justice WALDO, in *Crawford v. Linn County,* 11 Or. 482, 486 (5 P. 738), said:

"* * * The general assembly cannot, therefore, pass any law to conflict with the rightful authority of congress, nor perform a judicial or executive function, nor violate the popular privileges reserved by the declaration of rights, nor change the organic structure of the government, nor exercise any other power prohibited in the constitution. If it does any of these things, the judiciary claims, and in clear cases has always exercised, the right to declare all such acts void. But beyond this, there lies a vast field of power granted to the legislature by the general words of the constitution, and not reserved, prohibited or given away to others. Of this field, the general assembly is entitled to the full and uncontrolled possession. Their use of it can be limited only by their own discretion."

In speaking of the distinction which exists between the powers of congress and those of a state legislature, Judge Cooley said:

"It is to be borne in mind, however, that there is a broad difference between the Constitution of the United States and the constitutions of the States as regards the powers which may be exercised under them. The government of the United States is one of enumerated powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national Constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the constitution of the State to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the State was vested in its creation.

Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication; while the State legislature has jurisdiction of all subjects on which its legislation is not prohibited."

Cooley, Const. Lim. (8th Ed.), vol. 1, p. 354.

■ While it is true, as pointed out by Judge Cooley, op. cit., p. 127, that it is not lightly to be inferred that any portion of a written constitution is so ambiguous as to require extrinsic aid in its construction, yet it must be remembered that the constitution was adopted as a whole and a clause which, standing by itself, might seem of doubtful import may yet be made plain by comparison with other clauses or portions of the same instrument and, therefore, the whole instrument is to be examined with a view to arriving at the true intention of each part.

The same principle was announced in *State v. Ware,* 13 Or. 380, 402 (10 P. 885), and restated in *State v. Cochran,* supra, as follows:

" 'Our constitution upon the subject is sui generis, and must be interpreted in view of its various provisions and general scope and design.' That is, the whole instrument must be examined with a view to ascertaining the meaning of each and every part. Coke, Litt. 381a. In a written constitution the presumption and legal intendment is that each and every word, clause and sentence has been inserted for some useful purpose, for which reason the instrument must be construed as a whole; otherwise its intent and general purposes may not be ascertained. As a necessary result of this rule, it follows that, wherever it is practicable to do so, each provision must be so construed that it shall harmonize with all others, without distorting the meaning of any of such provisions, to the end that the intent of the framers may be ascertained and carried out, and effect given to the whole instrument: [Citing authorities].''

When the constitution is examined as a whole and the many instances where the framers used words of inhibition are noted, the fact that no such words were used in fixing these salaries indicates most strongly that it was not the intention of its framers to prohibit the legislature from increasing these salaries at any time when such increase should become necessary. That they did not so intend clearly appears from the proceedings of the convention, as shown by the Journal of the Constitutional Convention on pages 92 and 93, as published by the state printer pursuant to Senate Joint Resolution No. 6, adopted by the Senate September 23, 1882, and concurred in by the House on September 25, 1882, and also from "A History of the Oregon Constitution", edited by the Honorable Charles H. Carey, on pages 371–373. It appears from these published reports of the proceedings of the convention that, while section 1 of Article XIII was being considered, Mr. John C. Peebles, a member from Marion county, moved to amend, by adding to the end of the section the following words:

"Provided, further, That the salaries of the judges shall not be subject to increase, and the salaries of the Governor and Secretary shall never exceed two thousand dollars nor that of the Treasurer exceed twelve hundred dollars."

and that this proposed amendment was rejected. It further shows that on the same day, Mr. William H. Packwood, a member from Curry county,

"moved to amend section 1, on salaries, by striking out all after the word 'offices,' in fifth line, and insert the words 'nor shall the pay of any officer in this state be diminished or increased, except as provided for in the first section for the making of amendments to this constitution;' which was disagreed to."

It will thus be seen that the question of whether section 1 of Article XIII, as framed by the convention and as adopted by the people, would have the effect of prohibiting the legislature from increasing these salaries was considered by the framers and that they were of the opinion that it did not have that effect and that, since the proceedings of the convention were published in the two then leading newspapers of the state, the Oregon Statesman and the Oregonian, it would seem to follow that the people, in adopting the constitution, were of the same opinion and intended to leave the matter of increasing these salaries, whenever a necessity therefor should arise, to the discretion of the legislature. However, in January, 1887, certain members of the legislative assembly, in considering a proposed bill then pending before the legislature to increase the salaries of certain of the officers named in said article, were in doubt as to the power of the legislature, under the constitution, to enact the bill and thereupon the legislature requested a number of the most distinguished lawyers who had sat in the constitutional convention to give them their written opinions upon that question. So far as the record now available shows, every one of such persons was of the opinion that the legislature was not prohibited by the constitution from increasing such salaries. Honorable MATHEW P. DEADY wrote in part as follows:

"I have no doubt of the power of the legislature to increase the salaries of the Judges of the Supreme Court. * * * The language of the constitution on its face is fairly susceptible of the construction that the judges shall have the sum therein mentioned at least, and as much more as the legislature may provide. Certain it is that there is no express limitation on the power of the legislature to increase. In such a state of things,

even if it can be said that the arguments for and against the constitutionality of the measure are evenly balanced, the doubt ought to be reserved in favor of the increase, because it wrongs no one and is demanded by the public good."

Honorable George H. Williams, in his letter of January 24, 1887, expressed his opinion as follows:

"According to my recollection, an effort was made in the constitutional convention to amend the existing provision as to the salaries of supreme judges by declaring that their salaries should be $2,000 each per annum, and no more, and the amendment was voted down, leaving the implication that the object of the proposition in the constitution as it now stands was to fix minimum and not the maximum amount of the salaries."

Judge P. P. PRIM, referring to the section under consideration, also said:

"The above provision is to the effect that each shall receive that amount without containing a necessary implication that they shall receive no more if the legislature in its wisdom shall so provide. It is my understanding that a large majority of the members of the convention was opposed to inserting anything in the constitution prohibiting the legislature from increasing the salary of state officers at any time when such increase should become necessary."

Judge R. P. BOISE expressed his opinion as follows:

"All authorities on constitutional limitations hold that to deprive the legislative department of the state of the power to legislate concerning any matter touching the interests of the state, words of inhibition must be used." Referring to section 1 of Article 13, he says: "This cannot be construed to prohibit the assembly. which represents the sovereign power of the state from increasing these salaries, if in its judgment it ought to be done. I have frequently heard this matter discussed

and always entertained and often expressed the opinion that the assembly has this power.''

Judge E. D. Shattuck, in his letter to the legislature, said:

"First. That the constitution of Oregon is to be deemed, not a grant of powers, but as a limitation or restriction upon powers already existing.

"Second. That the legislative assembly of Oregon has power to order and enact whatever it may deem proper and useful upon all subjects, except where its action is restricted by the constitution.

"Third. That the limitation or restriction upon legislative action rendering void an act of the legislative assembly should be manifested by express terms and allowed only of cases free from doubt or uncertainty.

"Fourth. That there is no constitutional impediment to raising the salaries of state officers, directly by legislative action.''

Judge J. K. Kelly rendered an elaborate opinion upon the question and, in part, he said:

"We are not to ascertain whether the power to do a certain act of legislation is given to a legislature in a state constitution, but whether it is prohibited, and if not prohibited it can be exercised by the legislative body.''

Speaking of section 1 of Article XIII, he said:

"There is here no restriction upon the power of the legislative assembly to increase the salaries of the judges. If the words, 'and no more', had been added to that clause of the constitution then clearly there would have been no legislative power to increase the salary over $2,000, or if the framers of the constitution had employed the restrictive words which they did in regard to the compensation to be paid to members of the legislative assembly, then it would be an unconstitutional act to increase the salary.''

Honorable Stephen F. Chadwick, in his letter of January 24, 1887, said:

"It was my understanding that the prevailing opinion of that convention was that the legislature would have the power to increase the salaries of judges. From the action of the convention I was of that opinion myself. Every attempt to prevent the increase of salaries of judges by constitutional provision was promptly voted down. Such attempts were made as the proceedings will show."

The statements quoted above were published in the briefs filed in this court in *State v. Cochran,* supra, and also in Vol. XI, at page 82, of the Oregon Historical Publication for March, 1910.

■ All the men whose opinions are quoted above sat in the convention which framed the constitution, all were regarded as among the ablest lawyers of the state and, with the exception of ex-Governor Chadwick, all had been justices of the supreme court of Oregon. Judge Deady had presided over the convention and had, for many years, served as United States District Judge for the District of Oregon, while Judge Williams had served as Attorney-General of the United States under President Grant. Manifestly, no other persons at that time were better qualified to express an opinion as to the meaning of the constitution, or could speak more authoritatively, than these men and, therefore, their opinions upon the very question which we are now called upon to decide ought not lightly to be disregarded. While it is true (see Cooley, op. cit., pp. 142–144), that the constitution derives its force from the people who ratified it and not from the convention which framed it, yet these proceedings of the convention and the opinions of the men who took a leading part in framing the constitution are of great value in interpreting the meaning of the constitution, for as said in 12 C. J., p. 711:

"The proceedings of the constitutional convention and the debates while powerless to vary the terms of the constitution are nevertheless valuable aids in determining the purpose and consequent meaning of a doubtful provision. In examining the proceedings of a convention it is the intent of the people through their representatives that is sought for; but with a legislature it is the intent of the representatives themselves that is sought for; and generally the proceedings of a legislature are regarded as more conclusive and more satisfactory as a source of information than those of a convention. But in either case, where the proceedings clearly point out the objects and purposes of the doubtful provision, the aid to be obtained is valuable as a means of interpretation."

See also *McMullen v. Shepherd,* 133 Md. 157 (104 Atl. 424, 425), where the court said:

"In construing the Constitution we are to consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it, and one of the useful and most helpful sources is the debates of the convention."

When this provision of the constitution is viewed in the light of the construction that has been given to it by the legislative department of this state, we find that, at the first regular session of the legislature after the admission of the state into the Union, the legislature, by section 2 of an act approved October 19, 1860, appropriated, in addition to the annual salary of the governor, "For such other allowances of per diem and mileage to the Governor of the State as may be provided for by law, one thousand dollars, or as much thereof as may be necessary." See Laws of Oregon, 1859–60, p. 52.

Again, by an act approved October 17, 1862, the legislature made an additional appropriation of $3,000, or so much thereof as may be necessary, "for such

allowances of per diem and mileage to the governor of the state, secretary of state and treasurer of state, as has been, or may be, provided by law.'' (See Or. L., 1862, p. 64.) At the same session, by section 2 of a bill approved October 17, 1862, the legislature appropriated for the governor, a further salary of $400 per annum. (See Or. L., 1862, p. 71.)

By section 3 of an act of the legislature approved October 21, 1864, in addition to his annual salary, the governor was allowed $200 a year and all necessary traveling expenses to be paid quarterly. (See section 3, chapter 44, Title I, p. 701, General Laws of Oregon, compiled and annotated by Matthew P. Deady and Lafayette Lane.) On page 605 of the same volume appears another act of the legislature authorizing the secretary of state to charge and retain as additional compensation for the performance of the duties of his office certain fees specified therein.

By section 26 of an act approved February 18, 1893, (Laws, 1893, pages 23 and 24), the legislature appropriated the sum of $3,000 for the biennium, to be paid to the governor, the secretary of state and the state treasurer each at the rate of $500 a year, payable quarterly, as additional compensation to them for the performance of the duties of their offices.

The legislature, in 1895, provided as additional compensation that the governor should be paid $1,000 a year, and the secretary of state and the state treasurer each $500 a year, for their services in supervising public works, public buildings, etc., which was in addition to the compensation provided for by previous laws. (See Laws of Oregon, 1895, p. 47.)

In 1905, the legislature raised the annual salary of the governor to $5,000 and that of the secretary of state

and state treasurer to $4,500. (See chapter 68, Laws, 1905.)

In 1927, the governor's salary was raised to $7,500 and that of the secretary of state and state treasurer to $5,400 per annum. (See chapter 4, General Laws of Oregon, 1927.)

It is also material to consider the action of the legislature in raising the salaries of the justices of the supreme court prior to the amendment of November 8, 1910, since, if any impediment existed against increasing the salary of the governor, the same would apply equally to the justices of the supreme court. By an act approved October 17, 1872 (see Laws of Oregon, 1872, p. 29), there was appropriated for each of the several justices of the supreme court the additional sum of $1,000 per annum "to defray the traveling and other incidental expenses, to which said justices may be subjected in the execution of their official duties". And by an act approved February 18, 1889 (General Laws of Oregon, 1889, pp. 5 and 6), the salaries of each of the justices of the supreme court were increased from $2,000 to $3,500 a year, and, by an act filed in the office of the secretary of state February 24, 1903 (General Laws of Oregon, 1903, p. 182), these salaries were increased to $4,500 per annum.

From this legislation it will be seen that from the very first regular session of the legislature up to the present moment, a period of 76 years, a majority at least of the members of the legislature have construed section 1 of Article XIII as intending to fix minimum sums only and that the legislature could increase these sums whenever deemed necessary.

As against this practical construction of this provision of the constitution by the legislative department of this state, in enacting laws appropriating moneys to the governor, secretary of state, state treasurer and former justices of the supreme court and by such state officers in accepting salaries in excess of the sums specified in the constitution, which, in itself, amounts .to a practical construction of this provision by the executive and judicial departments of the state, and continuing as it has for a period of 76 years and comprising as it does the entire time that the state has been in existence, our attention is called to but two incidents where a contrary opinion as to the meaning of this provision of the constitution seems to have been entertained. It appears in the House Journal of 1870, p. 453, that Honorable L. F. Grover, then governor of Oregon, vetoed a bill passed by the legislature which increased the salaries of certain of the officers mentioned in this provision of the constitution, stating in his veto message that the salaries of these officers were fixed by the constitution and could not be increased without violating its provisions. His veto was sustained and the bill failed to become a law. This action by the governor, of course, shows that, at the time of the veto, the governor was of the opinion that the legislature had no power to increase said salaries. However, at the next session of the legislature, the same governor approved a bill increasing the salaries of each of the justices of the supreme court $1,000 over and above the amounts stated in the constitution, and this action upon his part shows that his opinion had been changed in respect to this question.

The second incident referred to is: The legislature, at its regular session in 1885, passed a joint resolution

to amend section 1 of Article XIII, so as to expressly provide that the salaries referred to therein might thereafter be provided by law, and, at the next regular session in 1887, the proposed amendment was submitted to the legislature and a bill passed directing the governor to call an election and submit such amendment, together with two other proposed amendments, to the people for their adoption or rejection, and, when the vote was taken, the people rejected each of the proposed amendments. At no other session of the legislature was any action taken indicating that the legislature had any doubt of its power to increase these salaries. Moreover, at every session of the legislature immediately following the adoption of the constitution, some of its members had sat in the convention and, by no action or vote of theirs, does it appear that they, or any of them, entertained any doubt as to the powers of the legislature.

Again, an examination of the House and Senate Journals of 1885 and 1887, and also the Session Laws of those years, shows that, at each of said sessions, moneys were appropriated in excess of the sums fixed by the constitution as salaries of said officers. Moreover, with the exception of Mr. Justice ROSSMAN and Mr. Justice BELT, each member of this court has been a member of the legislature and voted appropriations of moneys as salaries for the officers mentioned in section 1 of Article XIII, in excess of the amounts provided therein.

Hence, we are now confronted with a practical construction which has been continuously, for a period of 76 years, placed upon this provision of the constitution not only by the legislature but also by the executive and judicial departments of this state and, during that

time, the power of the legislature has never been questioned except in the two instances above referred to, and, during all said time, the people have acquiesced in this construction of this provision of the constitution and, until plaintiff brought this suit, no citizen has ever questioned, in any court proceeding, the power of the legislature to increase these salaries.

■ The object of construction, as applied to a written constitution, is to give effect to the intention of the people in adopting it and, when any particular provision of the constitution has received a practical construction for a period of 76 years by each of the three great departments of the state and such construction has been acquiesced in by the people for that whole period, the court should not apply a different construction to that provision unless its unconstitutionality is established beyond all reasonable doubt.

■ The proposed amendment to the constitution submitted by the legislature in 1887 contained a provision that the salaries of these officers should not be increased or diminished during their term of office and this evidently was one of the main purposes of the proposed amendment. Manifestly, a mere proposal of such an amendment could not overcome the practical construction that, from the very inception of the state government, had uniformly been given to section 1 of Article XIII by the legislative and executive departments of the state, particularly so since the people themselves had acquiesced in such a construction for so long a period of time, and, of course, the veto message of Governor Grover did not have that effect. Where, as said by Judge Cooley, op. cit., page 144:

"there has been a practical construction, which has been acquiesced in for a considerable period, considera-

tions in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which it is not easy to resist. Indeed, where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention. And where this has been given by officers in the discharge of their official duty, and rights have accrued in reliance upon it, which would be divested by a decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight.''

In a footnote, he says:

''It requires a very clear case to justify changing the construction of a constitution, conceded to be somewhat involved, which has been uninterruptedly acquiesced in, for so long a period as fifty years. State v. Frear, 138 Wis. 536, 120 N. W. 216, 16 Ann. Cas. 1019.''

Upon this subject Mr. Chief Justice Marshall, in *Cohens v. Virginia*, 6 Wheat. 264, 418 (5 L. Ed. 257), said:

''great weight has always been attached, and very rightly attached, to contemporaneous exposition.''

In discussing this question, Judge Cooley, op. cit., p. 416, says:

''In Bank of United States v. Halstead, (10 Wheat. 51, 63,) the question was made, whether the laws of the United States authorizing the courts of the Union so to alter the form of process of execution used in the Supreme Courts of the States in September, 1789, as to subject to execution lands and other property not thus subject by the State laws in force at that time, were constitutional; and Mr. Justice Thompson, in language similar to that of Chief Justice Marshall in

the preceding case, says: 'If any doubt existed whether the act of 1792 vests such power in the courts, or with respect to its constitutionality, the practical construction given to it ought to have great weight in determining both questions.' And Mr. Justice Johnson assigns a reason for this in a subsequent case: 'Every candid mind will admit that this is a very different thing from contending that the frequent repetition of wrong will create a right. It proceeds upon the presumption that the contemporaries of the Constitution have claims to our deference on the question of right, because they had the best opportunities of informing themselves of the understanding of the framers of the Constitution, and of the sense put upon it by the people when it was adopted by them.' Like views have been expressed by Chief Justice Waite in a recent decision.

"Great deference has been paid in all cases to the action of the executive department, where its officers have been called upon, under the responsibilities of their official oaths, to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed all considerations, and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind. (So construction of the constitution adopted by the legislative department, and long accepted by the various agencies of government and the people, is, where the meaning of the language construed is capable of two interpretations, entitled to great weight.)"

See also *Evanhoff v. State Industrial Accident Comm.,* 78 Or. 503 (154 P. 106), where Mr. Justice Mc-Bride, in referring to contemporaneous construction of a provision in the state constitution, said:

" * * * While such a construction will not be permitted to overturn and render nugatory a clear provision of the Constitution, in cases where the mean-

ing of a clause in the instrument is capable of two interpretations, it is entitled to great weight."

Mr. Justice LORD, in *Cline v. Greenwood,* 10 Or. 230, 241, speaking for the court, said:

"* * * But did we entertain any doubt whether the legislature had exercised its power in the mode prescribed by the constitution, we should be compelled to dissolve that doubt in favor of the constitutionality of the mode which the legislature had adopted. Before a statute is declared void, in whole or in part, its repugnancy to the constitution ought to be clear and palpable and free from all doubt. Every intendment must be given in favor of its constitutionality. Able and learned judges have, with great unanimity, laid down and adhered to a rigid rule on this subject. Chief Justice Marshall, in 5 Cranch, 128; Chief Justice Parsons, in 5 Mass. 534; Chief Justice Tilghman, in 3 S. & R., 72; Chief Justice Shaw, in 13 Pick., 61, and Chief Justice Savage, in 1 Cowen, 564, have with one voice declared, that 'it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts be considered void. The opposition between the constitution and the law should be such that the people feel a clear and strong conviction of their incompatability with each other.' ''°

In *Crowley v. State,* 11 Or. 512, 513 (6 P. 70), this court, speaking through Mr. Justice LORD, said:

"* * * A statute will not be declared void, in whole or in part, unless its invalidity is distinctly pointed out and made clearly manifest. The general rule is that every intendment must be given in its favor."

In *Kadderly v. Portland,* 44 Or. 118, 143 (74 P. 710, 75 P. 222), this court speaking through Mr. Justice BEAN, said:

"* * * A proper respect for a co-ordinate branch of the government demands that all intendments in favor of the regularity of its proceedings shall be in-

voked, and, unless its violation of the constitution is clear and palpable, its act will be sustained. This rule has been often announced in the strongest language, varied only to give force of expression.''

Again, Judge Cooley said:

''It has been said by an eminent jurist, that when courts are called upon to pronounce the invalidty of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.''

Cooley, op. cit., p. 371.

It is inaccurate to say, as has been contended here, that the purpose of the initiative amendment, adopted November 8, 1910, now section 1 of Article VII of the constitution, was to authorize the legislature to increase the salaries of the justices of the supreme court. The purpose of that amendment was clearly set forth in the pamphlet compiled and issued by the secretary of state under and pursuant to chapter 226, Laws of 1907, which contained the amendments to be voted upon and the arguments for and against their adoption. In said pamphlet no mention whatever is made of section 1, Article XIII, nor of any proposed increase in the salaries of the justices of the supreme court. Under the law, that pamphlet was distributed to all the registered voters in the state and the arguments advanced in support of the amendment, as set forth in the pamphlet and so distributed, was, in part, as follows:

''JUDICIARY AMENDMENTS. ARTICLE VII. The purpose of this amendment is to remove restric-

tions on the power of the people to make a law for any kind of court they want; to allow the people and the legislature to transfer to the circuit court the law and probate business of the county judge in counties where that can be done to good advantage; to simplify procedure on appeals to the supreme court and remove the pretext for new trials in those cases in which substantial justice is done by the verdict and judgment, but in which the trial court may have made a technical mistake; or if the verdict is just and the judgment is not, to make it the duty of the supreme court to enter the proper judgment, if that can be done, instead of sending the case back for a new trial; to allow the supreme court to take original jurisdiction in important cases of habeas corpus, mandamus and quo warranto, the latter being used principally to try the title to offices; to prevent mistrials and hung juries, by allowing three-fourths of a jury to render a verdict in civil cases. The amendment also removes the constitutional restrictions on the power of the people and the legislature over the offices of the county clerk, the sheriff, the county judge, and the district attorney.

"Many states now allow a majority of the jury in civil cases to render a verdict. Usually three-fourths of the jury is required to render a verdict. No state has gone back to the old system of unanimous verdict in civil cases, after having experience with the majority verdict. * * *

"Every voter knows of hung juries in civil cases, followed by new trials, appeals to the supreme court, reversals and another new trial, and perhaps yet another appeal to the supreme court. There have been such cases in the Oregon courts. One purpose of this amendment is to make that kind of injustice impossible in which the corporation or the rich man wins because of the longest purse."

■ Plaintiff contends that there is no ambiguity in the language: "The governor shall receive an annual salary of fifteen hundred dollars". The uncertainty, it

will be noted, is not in the words or figures used in fixing the amount but as to whether, in fixing that amount, it was the intention to limit and restrict the power of the legislature to increase or decrease that amount. Had the constitution said: "fifteen hundred dollars, and no more", there would have been no question of intent and no room for construction, but it did not do so, and there is no express limitation on the power of the legislature and the question is: Is such a limitation to be implied from the language used when not that provision alone but all the provisions of the constitution as then adopted are considered and construed as a whole? When this is done, it will be seen that the question is not so much the amount of the salary but whether the constitution was intended to limit the power of the legislature. That the meaning of the words used was believed to be ambiguous and uncertain by a considerable number of the framers of the constitution clearly appears from the proceedings of the convention to which we have referred. Otherwise, what object could there have been to move to amend by adding the words that these salaries should not be increased or diminished or that that could be done only by an amendment to the constitution? It is also obvious that those favoring said motions believed that section 1 of Article XIII left the legislature free to increase or decrease these amounts, or otherwise there can be no reasonable explanation for their making or supporting such motions. It is also obvious that those opposing said motions were of the same opinion that these amounts could be increased or decreased by the legislature for otherwise there can be no reasonable explanation offered for their opposition. Hence, it is idle to now say that there is no uncertainty in the language used or

that the words used are to be construed as in a contract of hire between private individuals where the compensation is fixed in a definite sum and such words are not qualified or limited by other provisions in the contract.

■ It is not reasonable to contend that that part of section 1 of Article XIII, which provides: "They shall receive no fees or perquisites whatever for the performance of any duties connected with their respective offices", or that part which provides: "the compensation of officers, if not fixed by this constitution, shall be provided by law", was intended in any way to limit the power of the legislature to increase the salaries of the officers named in said article. The first clause was intended merely to prohibit the acceptance of any fee or perquisite by any state officer as an inducement for the granting of official favors through the corrupt use of money, or, in other words, to prevent official corruption upon the part of any state officer in the performance of his duties. The last clause was intended merely to authorize the legislature to fix the salaries of officers created by the constitution for the payment of which no provision was made in the constitution, such as the superintendent of public instruction, circuit judges, district attorneys, county clerks, sheriffs, county coroners, county surveyors, county judges, county commissioners, and the like.

■ Nor is it reasonable to say that the compensation of the members of the legislature, when convened in extra session by the governor, is not limited to $3 per day. The language of section 29 of article IV is as follows:

"The members of the legislative assembly shall receive for their services a sum not exceeding $3 a day, from the commencement of the session; but such

pay shall not exceed in the aggregate $120 for per diem allowance for any one session. When convened in extra session by the governor, they shall receive $3 per day; but no extra session shall continue for a longer period than 20 days. * * *''

The express limitation contained there is that the members of the legislative assembly shall receive for their services a sum not exceeding $3 a day ''from the commencement of the session'', and this limitation applies to extra sessions called by the governor as much as it does to regular sessions of the legislature.

 If plaintiff's contentions could be sustained, it would not be for the public interest. It is a matter of common knowledge that the duties and responsibilities of the governor, secretary of state and state treasurer have increased enormously since the constitution was framed in 1857, and, if their salaries were limited to $1,500 for the governor and secretary of state and $800 for the state treasurer, manifestly it would be difficult to find persons who could afford to assume those responsibilities and perform those duties for such limited compensation. The records of the state treasurer's office show that approximately one hundred million dollars pass through his hands each year and that he is charged with the duty of protecting an average daily balance in his hands of about ten million dollars. No reasonable person would consider $800 a year adequate compensation for the assumption of such responsibilities and the performance of such duties. For this reason alone, the argument *ab inconvenienti* is entitled to serious consideration.

While we realize that this opinion has been extended to an almost unreasonable length, yet, because of the importance of the question, before closing our dis-

cussion, we deem it important to cite one additional authority. In *Eddy v. Kincaid*, 28 Or. 537 (41 P. 156), this court said:

"* * * We have thus for a series of years concurrent legislative exposition of the constitution to which the court ought to yield unless satisfied that it is repugnant to its plain words. Of course, the plain provisions of the constitution can not be broken down by practical exposition, but when, as here, such a practice is in violation of none of its express provisions, such an exposition is a very persuasive argument, and often of controlling force. In speaking of the effect of practical exposition it was said by an able court that 'It has always been regarded by the courts as equivalent to a positive law': Bruce v. Schuyler, 4 Gilman, 267, 46 Am. Dec. 447. And in Rogers v. Goodwin, 2 Mass. 477, in giving a reason for adhering to long continued exposition, it is said: 'We can not shake a principle which in practice has so long and extensively prevailed.' Indeed, harmony prevails throughout the whole scope of judicial opinion on this question: Cline v. Greenwood, 10 Or. 230; Hovey v. State, 119 Ind. 386, 21 N. E. 890, and authorities there cited. Independently, then, of judicial authority, we should hesitate to declare the act in question unconstitutional because of the practical exposition given to the constitution by the legislature, and acquiesced in by the other departments of government and the people."

Upon the other ground of demurrer, plaintiff's alleged want of capacity to sue, we think the question is foreclosed by *McKinney v. Watson*, 74 Or. 220 (145 P. 266); *Eastern & Western Lumber Co. v. Patterson*, supra; and *Jones v. Hoss*, supra.

■ For the reasons stated, the decree appealed from is affirmed, but, since the question involved concerns a matter of great public importance, no costs shall be

taxed in favor of either party in this or the court below.

CAMPBELL, C. J., BELT, ROSSMAN, BEAN and BAILEY, JJ., concur.

KELLY, J., dissents.

———

KELLY, J. (dissenting.) Article XIII of the constitution of the state of Oregon is as follows:

## "Article XIII
### Salaries.

§ 1. Salaries of the State Officers.—The governor shall receive an annual salary of fifteen hundred dollars. The secretary of state shall receive an annual salary· of fifteen hundred dollars. The treasurer of state shall receive an annual salary of eight hundred dollars. The judges of the supreme court shall each receive an annual salary of two thousand dollars. They shall receive no fees or perquisites whatever for the performance of any duties connected with their respective offices; and the compensation of officers, if not fixed by this constitution, shall be provided by law."

In 1927, the legislature amended the statute concerning the salary of governor and other officers, which amendment, in so far as it applies to the officers named in the above quoted article XIII, is as follows:

."67-601. Salary of Governor, secretary of state, state treasurer and attorney-general.—The several officers of this state hereinafter mentioned shall, during their continuance in office, be entitled to receive the annual salaries hereinafter respectively set forth, which salaries and each of them shall be payable monthly, in the same manner as are salaries of other officers, as full compensation for all services performed by virtue of their respective offices, to wit:

"The governor, $7,500 per annum.
"The secretary of state, $5,400 per annum.
"The state treasurer, $5,400 per annum.
* * * "

The purpose of this suit is to determine whether or not the statute above quoted is a valid constitutional law or is invalid because in conflict with Article XIII of the constitution as above set out.

Five grounds have been urged in support of the validity of the statute in question.

1. That the amounts specified as salaries in the constitution are minimum sums only and are not the maximum amounts which may legally be fixed by the legislature.

2. That contemporary construction discloses that article XIII was not intended to be indefinitely effective to the extent of continually preventing legislative increases in such salaries.

3. That negative provisions and express limitations to specific amounts in other parts of the constitution show that no such limitation or restriction was intended by the language employed in Article XIII.

4. That subsequent enactments by the legislature comprise a practical construction to the effect that Article XIII is not now effective to restrain the legislature from prescribing such salaries as it deems appropriate.

5. That applying the doctrine *ab inconvenienti*, that is from inconvenience, it is manifest that such confusion, disarray and chaos would now result by enforcing the constitutional mandate that public policy de-

mands that such constitutional restrictions be disregarded, ignored and declared to be ineffective.

Of these in their order—

Dealing first with the suggestion that Article XIII merely fixes a minimum compensation for. the officers named. It is said that if a maximum amount had been intended, some such phrase would have been employed as "not exceeding", so that in the case of the governor's salary, Article XIII would have read, "The governor shall receive an annual salary", *not exceeding* "fifteen hundred dollars".

If such a rule of construction must be applied, it seems to the writer that in order to fix merely a minimum compensation, some such phrase as "not less than" would necessarily precede the amount named.

Applying it to the statute above set out, the secretary of state could not determine how to draw the salary warrants each month because the statute does not say that the several officers mentioned shall receive not less than and not more than the salaries therein set forth, which is an absurdity.

Chapter XXVIII, Oregon Code 1930, is devoted to salaries of county officers. The same construction we here give to Article XIII of the constitution should be given to these statutes. Unlike section 67-601, supra, most of these statutes do not contain the word "full" modifying the word "compensation". To the writer, therefore, it appears that to hold laws concerning official salaries to be doubtful, uncertain, or ambiguous, if and when they do not expressly apply some such restrictive modifying phrases as "not less than" and "not more than" to the respective amounts named

therein, is to introduce a trouble inviting, rather than a chaos preventing, wedge of unwarranted, unsound and unjustified judicial construction where, heretofore, no one has thought or dreamed that there could possibly be any other meaning attributed to such laws than the one universally accepted to the effect that the salaries named therein are thereby definitely, specifically and exactly fixed. Let us think what the court would do, if a taxpayer would seek to enjoin the payment of county salaries prescribed in said chapter XXVIII on the ground that the statute is vague, indefinite, uncertain and to be understood only by recourse to extrinsic construction.

The only ground for giving effect to extraneous construction of any kind, whether contemporary, legislative, practical or judicial, is uncertainty or ambiguity in the language of the law so construed. If the article of the constitution named is not uncertain, doubtful or ambiguous, then defendant's salary is fixed therein. If it is so fixed, any attempted change therein by legislative enactment is ineffective because at variance with the fundamental, supreme, organic law of the state.

This court having said in *Jones v. Hoss*, 132 Or. 175 (285 P. 205), that the legislature can not award more than the compensation mentioned in the constitution to members of the legislature for attendance upon its general sessions, it would likewise be absurd to say that it might award any amount without limit for attendance at its extra sessions, yet to hold that the constitutional compensation named for the governor is merely the minimum and may be increased at the pleasure of the legislature is tantamount to so holding with respect to the per diem compensation of legislators while serving in extra sessions. Section 29 of

Article IV of the constitution contains this provision, "when convened in extra session by the governor, they shall receive three dollars per day". There is no other constitutional provision respecting pay of legislators for attending extra sessions of the legislature. Applying the rule invoked in behalf of defendant, the prescribed three dollars per diem for attendance at extra sessions is merely the minimum amount of compensation members of the legislature may be awarded by the legislature. The writer is not in accord with that view.

Let us suppose that A executes a contract with B whereby B enters the employment of A in a specified capacity and such contract contains these words, "B shall receive an annual salary of fifteen hundred dollars". Is there a court in the United States that would permit B to recover a greater sum than fifteen hundred dollars for a year's services in that specified capacity on the ground that the sum of fifteen hundred dollars was merely the minimum amount which A agreed to pay, and, the specified services being of greater value than that, A ought to pay a greater amount?

Neither would any court support A in the contention that the sum mentioned in the contract was merely the maximum amount possible for B to recover and, that, the specified services being of less value, B should be awarded only a less amount than the agreed price.

Every rule of law known to the writer would bind both A and B to the prescribed sum of fifteen hundred dollars. Fifteen hundred dollars would be neither a minimum nor a maximum, but it would be the exact amount fixed by the contract just as the various sums

mentioned in Article XIII are the amounts fixed by the constitution, and the various sums mentioned in section 67-601, supra, are the amounts fixed by the statute.

If the compensation of the officers named in Article XIII is not fixed by the constitution, then the per diem of legislators at extra sessions is the only compensation of officers so fixed. The maximum compensation only for legislators in attendance at sessions other than extra sessions is fixed by said section 29 of Article IV. No attempt is made throughout the entire constitution to specify the compensation to be received by any other officer or officers than those mentioned in Article XIII except in section 29 of Article IV as above stated.

Noting that the provision, concerning compensation of officers being provided by law, if such compensation is not fixed by the constitution, is found only in Article XIII and is not found in Article IV, the conclusion is irresistible that the officers referred to as those whose compensation is fixed by the constitution includes the officers named in said Article XIII. If not, the only logical, orderly, intelligible place for such provision would be in, or immediately following, section 29 of Article IV. If the officers named in Article XIII were not meant as the excepted class, whose compensation should not be provided by law, then the only excepted class are the members of the legislature and it would have been the most natural thing in the world for the constitution makers merely to have said in effect, compensation of officers, except that of legislators as herein prescribed, shall be provided by law. This was not done. In a word, Article XIII may well be deemed to be complete in itself. It means what it says and says what it means.

From the oft-repeated use in the constitution of the term, "provided by law", no possible doubt can arise that it means, provided by enactment of the legislative branch of the state, as distinguished from constitutional mandate and from the action of the judicial and administrative or executive branches.

As to contemporary construction, we have no verbatim or stenographic report of the debates. All we have, aside from newspaper comment, is a report of some proposed amendments, which, at best merely disclose a dissatisfaction, on the part of a minority of the membership of the convention, with the present form of the constitutional clause under consideration. The writer thinks that it is to be assumed that the majority, who declined to adopt the proposed amendments, deemed the present constitutional provision clear and unambiguous.

The statements of members of the convention as to the construction of this perfectly plain provision of the constitution, which statements were made years after its adoption, when memory was bedimmed, and radically changed, personal, political and official relationships predominated, have far less weight with the writer "than a bird's egg blown". The point is that the ambiguity or uncertainty must appear in the constitution itself, not in the minds of members of the convention, or of legislators, or of jurists. No rule of construction known to the writer renders the clause in Article XIII fixing salaries uncertain, vague, indefinite, ambiguous or doubtful. Only when the instrument itself betrays uncertainty or ambiguity may recourse be had to what sages and supermen thought about it.

In the opinion of the court, we are told:

"The uncertainty, it will be noted, is not in the words or figures used in fixing the amount."

With this statement, it would seem that there could be no difference between the concurring majority and the writer who dissents. The writer most emphatically insists that there is no uncertainty, doubt, ambiguity or vagueness in the words or figures used in fixing the amount. That being the case, why discuss other parts of the constitution such as section 29 of Article IV wherein the compensation of legislators is fixed? There is no uncertainty in either. The compensation is fixed in both cases. We are concerned only with Article XIII. There being no ambiguity, no uncertainty, no doubt, there is no occasion for any construction. The constitution speaks. All of us are agreed that the compensation of the officers named therein is thereby fixed.

In the case of the legislators, this court has said that, because the constitution has fixed their compensation, the legislature is without authority to change it. There is no express limitation, other than the clause fixing the amount of compensation for legislators which declares that such compensation may not be changed. The term, "not exceeding" sheds no light upon the authority of the legislature to change the compensation. It is the fact that the compensation is fixed by the constitution that stays legislative action thereon.

In the opinion of the writer, where the salary of an officer is definitely fixed by the constitution, only a constitutional amendment can legally change it.

The majority say that the ambiguity or uncertainty is as to whether it was the intention to restrict the

power of the legislature to increase or decrease that amount. As stated, the writer thinks that definitely, certainly and unambiguously fixing the exact amount of an official salary in the constitution, as it seems to be conceded that our constitution has done, is itself an express, unequivocal, imperative restriction and inhibition upon the power of the legislature to speak at all on the subject, except in literal, absolute and complete compliance therewith.

Moreover, to the writer, nothing could be plainer than the following clause, "the compensation of officers, if not fixed by this constitution, shall be provided by law". The distinguished jurists, who were members of that convention, knew, all of the members must have known; in fact, the newest tyro in any high school class on civics knows, that the purpose of a constitutional provision, concerning the power of the legislature, is to inhibit and curb. Such a provision can have no other purpose, no other effect. This provision certainly can not be tortured into having the effect of a grant of power. It must have been in the minds of the members of the constitutional convention that the legislature of Oregon, like the legislatures of all other states, was to have plenary power except as restricted by the constitution of the state, the federal constitution, treaties or congressional enactments. "Expressio unius est exclusio alterius." When the officers, whose compensation is not fixed by the constitutional provision, are expressly included or mentioned as those whose compensation was deemed the proper subject of legislative action, the officers whose compensation is fixed by the constitution, were excluded from the realm or jurisdiction of legislative action. Thus understood, the constitutional clause just quoted meant,

now means, and as long as the purpose of such constitutional provision remains as it is, that is merely to prohibit, to limit, the power of the legislature, it will continue to mean that the compensation of officers fixed by this constitution shall not be provided by law.

As to negative provisions in other parts of the constitution, the writer does not find it necessary to have recourse to them in order to find words of negation and express prohibition, for the reason that such words are no more impressively employed anywhere else in the entire constitution than in the following clause—"they shall receive no fees or perquisites whatever for the performance of any duties connected with their respective offices". Avoidance of iteration of that method of expression in the same section is to be commended rather than to be construed as introducing an ambiguity. To the writer, the use of words of negation and express prohibition in other parts of the constitution ought not to weaken the force of such words in the section under discussion. Neither do they aid in construing the section containing such words.

In considering the so-called practical or legislative construction of Article XIII of the constitution, we find that the clause containing the words of negation and express prohibition was the one first to be violated. The allowance of per diem and mileage to the governor and the appropriation of one thousand dollars therefor (Laws of Oregon, 1859-60, p. 52) evidences that fact.

The act of 1859-60, supra, and four subsequent violations of this constitutional clause containing words of express inhibition and negation are cited in support of the proposition that, if the last clause of the section had expressly, that is, by words of negation and express prohibition, withheld from the legislature the powers

to legislate, such final clause would have been effective. Such effectiveness does not even keep the promise to the ear. It failed in all the five instances mentioned.

As the writer views it, the implication on the final clause of section 1 of Article XIII, is so cogent and convincing that it was not until 1905, that is, more than 47 years after its adoption, that it was disregarded. Twice, since 1905, the legislature had passed salary legislation at variance with it.

Five violations of the clause expressly prohibiting payment of fees and perquisites and three violations of the clause which, by the strongest implication, withholds from the legislature any authority to change the salaries prescribed, are insufficient to persuade the writer that the constitutional provision under discussion is ambiguous. The writer does not attribute venality to any officer. What is here stated is that, in the opinion of the writer, Article XIII of the constitution is not ambiguous or doubtful.

"Where, * * * no ambiguity or doubt appears in the law, we think the same rule obtains here as in other cases, that the court should confine its attention to the law and not allow extrinsic circumstances to introduce a difficulty where the language is plain. To allow force to a practical construction in such a case would be to suffer manifest perversions to defeat the evident purpose of the law makers.

" 'Contemporary construction * * * can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.' " 1 Cooley's Const. Lim. (8th Ed.) p. 149, and authorities cited in note 1.

"The construction placed upon a provision of the constitution by the legislative and executive branches of the government will not be permitted to overturn

and render nugatory a clear provision of the constitution." *Amos v. Mosley,* 74 Fla. 555 (77 So. 619, L. R. A. 1918C, 482).

The writer is in accord with Judge Cooley's opinion as thus expressed.

"We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor, the doubts which arise on reading the instrument to be construed." Ibid, pp. 150, 151.

The writer thinks no reasonable doubt can arise upon reading the instrument in suit and hence, recourse to contemporary or practical construction is both unnecessary and unwarranted.

The late Mr. Justice BURNETT in his specially concurring opinion in *Evanhoff v. State Industrial Accident Commission,* 78 Or. 503, 504 (154 P. 106), expressed the view of the writer in saying that continued violations of a plain mandate of the constitution should not be dignified into contemporaneous construction.

In 1870, Governor Grover vetoed a bill to increase the salary of justices of the supreme court, because at that time such salary was fixed by Article XIII. This could well be considered as a practical construction of said article, especially when we have in mind that Governor Grover was a member of the constitutional convention.

In 1887, the legislature submitted to the people a proposed constitutional amendment changing Article XIII by omitting therefrom the provision fixing the amount of the salaries and providing that the officers therein named and other officers of the state should each receive an annual salary of such sum as the legis-

lative assembly should thereafter by law for each of. such officers provide: Laws of Oregon, 1887, p. 343.

This proposed amendment originated in 1885 as Senate Joint Resolution No. 12, and was then adopted by both houses. Laws of Oregon, 1885, pp. 487, 488. This action, approved by two legislative assemblies, might also well be deemed a practical construction of Article XIII to the effect that it limits the power of the legislature upon the matter of salaries to those of officers not named in said article.

On November 8, 1910, an initiative amendment of Article VII was adopted providing, among other things, that the compensation of judges may be provided by law.

As stated, originally Article XIII included judges of the supreme court among the officers whose compensation was therein fixed. Certainly, to impute a vain, unnecessary enactment to an entire electorate is unthinkable. Regardless of the campaign propaganda in favor of reformed appellate procedure, to provide, as in the amendment of Article VII adopted by the electorate, that the compensation of supreme judges might be provided by law, could have but one purpose and that purpose was to amend Article XIII in that regard. The electorate deemed it necessary to make such amendment. It would have been vain and useless to adopt the provision just mentioned in Article VII as amended, if the legislature had not been deprived by Article XIII of the power to legislate concerning such compensation. The mandate of all the voters, as expressed by a majority thereof, also might well be considered a practical construction of the constitutional provision affected.

The writer finds nothing ambiguous or doubtful in the constitutional provision under discussion and

hence, gives no weight to such or any practical construction thereof.

The sharp difference between the views of the majority on the question here involved and those of the writer is most distinctly shown by the statement in the opinion of the court to the effect that a vote in favor of a general appropriation bill containing an item, supported only by a former unconstitutional statute, may be deemed to be a practical construction of the constitution to the effect that the constitution is uncertain, doubtful and ambiguous and that its real meaning is to be found in the statute rather than in the constitution itself.

The writer has found no case where a vote in favor of a general appropriation bill has been held to be a legislative construction of a concededly uncertain, doubtful and ambiguous constitutional provision pertaining to but one item in such appropriation measure, much less where such a vote has been given the miraculous effect of transforming plain, clear, distinct and certain language in a constitution into vagueness, indefiniteness, doubt and ambiguity.

Any one at all familiar with the procedure attendant upon the consideration of the items of a general appropriation bill knows that such consideration usually is given in the committee of the whole of each house. No record of the discussions in such committee is made. Those who believe that the ultimate result of the committee's deliberations is the best that can be secured, and who appreciate that the orderly process of government under the law requires means to defray operating expenses usually vote in favor of the bill which the committee approves; but many times those who so vote are not in accord with the basis for some

of the items included in the bill. Their vote may be explained by the suggestion that the defeat of the bill in its entirety was not advisable for fear that it might be followed by the passage of one much worse, and they may have so expressed themselves in the committee. To the writer, it appears like a drowning man clutching at a straw to seek support from such a strained, and unprecedented contention as that which gives such remarkable and hitherto unheard of vitality, force and distinctiveness to a single item in a general appropriation bill.

One argument advanced to show that the provision concerning salaries, as set forth in said Article XIII, was intended to be effective only during the babyhood of the state, is that the framers of the constitution were far-seeing men, who must have visioned that there would be a great future increase in population, and that the time would soon come when these salaries would be wholly insufficient to compensate the officers named. They were the same men who immutably fixed the per diem of legislators at not more than $3 per day. In the opinion of the court, we are told that five of the present members of this court were glad to perform the services of legislators. Repeatedly, the ablest men in public life perform that service. This court has held that any attempt by the legislature to increase their compensation beyond the amount fixed by the constitution is futile. The writer finds no distinction between the gravely responsible and exceedingly onerous service of a legislator and that of a governor or other officer. The writer thinks that the framers of the constitution did not give the sauce of ambiguity, indefiniteness and uncertainty to the provision fixing the salary of the governor, secretary of state and

treasurer in order that a new and different service would be forthcoming, and at the same time serve as legislative compensation the sauce of immutability, exactitude and certainty in order that no other service could be effected except by a constitutional amendment. Without intending to impute fowl characteristics either to the officers named in Article XIII or to the honorable members of the legislature, the writer thinks that the framers of the constitution were actuated by that well known maxim of Gellius, "Idem Accio quod Titio jus esto". (The same for Accius as that which may be right for Titius.) Or, in other words, "What is sauce for the goose is sauce for the gander". If $1500 per year is altogether too small for the services of a governor, certainly, three dollars a day is likewise pitiably inadequate as compensation for the able and distinguished members of the legislature. In a word, the makers of the constitution placed public service before private emolument.

Moreover, provision was elsewhere made for changes in other respects based upon the state's attainment of a given population. If such a thought had affected the fixing of official salaries, it would have been expressly made applicable thereto.

As to the doctrine, *ab inconvenienti*, the writer ventures to quote an expression found in a footnote of Cooley's Constitutional Limitations (8th Ed.), Vol. 1, p. 152.

"* * * We agree with the supreme court of Indiana, that, in construing constitutions, courts have nothing to do with the argument ab inconvenienti and should not 'bend the constitution to suit the law of the hour.' Greencastle Tp. v. Black, 5 Ind. 557, 565, and with Bronson, C. J. in what he says in Oakley v. Aspinwall, 3 N. Y. 547, 568: 'It is highly probable that in-

conveniences will result from following the constitution as it is written. But that consideration can have no force with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of government. Written constitutions will be more than useless. Believing, as I do, that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be avoided or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural construction, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government, opens the door for another which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost and the powers of the government are just what those in authority please to call them.' "

All of the authorities coming to the attention of the writer based upon the doctrine, *ab inconvenienti*, involve matters of much graver concern than merely conforming official compensation to the amount prescribed by the constitution. The three officers here affected are most estimable gentlemen; and, personally,

it is anything but pleasant to indicate that their official emoluments should be restricted to the constitutional salaries. Such a ruling, however, involves no confusion to the public, no disarray of numerous and diverse interests, no far spread ruin.

If the statute creating the state industrial accident commission had been declared unconstitutional upon the ground urged before this court, it would have thrown the Irrigation Code, the Minimum Wage Act, the Public Utilities Act and much other legislation into hopeless disarray: *Evanhoff v. State Industrial Accident Commission*, 78 Or. 503 (154 P. 106).

Most serious confusion would have ensued if the federal supreme court had declared the work of the circuit courts unauthorized because the supreme court judges serving as circuit judges had no right to do so: *Stuart v. Laird*, 1 Cranch (U. S.) 299 (2 L. Ed. 115).

The same comment is applicable to the holding of the Ohio court refusing to declare legislative divorces invalid. There, the court say:

"To deny this long-exercised power, and declare all the consequences resulting from it void, is pregnant with fearful consequences. If it affected only the rights of property, we should not hesitate; but second marriages have been contracted, and children born, and it would bastardize all these, although born under the sanction of apparent wedlock, authorized by an act of the legislature before they were born, and in consequence of which the relation was formed which gave them birth." *Bingham v. Miller*, 17 Ohio 445, 449 (49 Am. Dec. 471).

The same observation applied to the Illinois case upholding the validity of special statutes creating non-municipal corporations not possessing banking powers.

The following is an excerpt from the opinion in that case :.

"Special acts have been so long the order of the day, * * * until their acts of this description fill a huge and misshapen volume, and important and valuable rights claimed under them. * * * it would now produce far spread ruin to declare such acts unconstitutional and void." *Johnson v. Jolich and Chicago Railroad Co.*, 23 Ill. 202, 207.

The writer is free to say that, in his opinion, the constitutional salaries of governor, secretary of state and treasurer are not commensurate with the value of the services now being performed by those officers. If he could convince himself that the court has, or that the legislature had, the authority to amend the constitution, the problem would be solved; but a judge can only declare the law as he thinks it is, not necessarily as he thinks it ought to be.

As well stated by Mr. Justice BELT in *Jones v. Hoss*, supra, "* * * the inadequacy of compensation is a political and not a judicial question."

Where, as in the case at bar, the constitutional limitation is plain, unambiguous and certain, mere contemporary or practical construction can not avail to annul it. Where, as in the instant case, no great confusion will attend its enforcement, the argument from inconvenience (*ab inconvenienti*) is entitled to no consideration. The sole duty of the court is to declare ita lex scripta est. To the extent the amounts prescribed in the statute as salaries for the officers named exceed the amounts fixed by the constitution, the writer thinks that the statute in question is unconstitutional.

For these reasons the writer dissents.