Argued February 7, affirmed in part; reversed in part;
remanded May 14, 1975

WARREN DERAS, *Respondent and
Cross-Appellant, v.*
CLAY MYERS, Secretary of State of the State of
Oregon, *Appellant and Cross-Respondent.*

535 P2d 541

*Lee Johnson,* Attorney General, Salem, argued the cause and filed briefs for appellant and cross-respondent.

*Warren Deras,* Portland, argued the cause and filed briefs pro se.

Kenneth J. Guido, Jr., Washington, D. C., and Charles H. Habernigg, Marcus Wood, and Rives, Bonyhadi & Drummond, Portland, filed a brief amicus curiae representing Common Cause.

Morton A. Winkel, Portland, filed a brief amicus curiae representing the American Civil Liberties Union of Oregon, Inc.

Hans A. Linde, Eugene, filed a brief amicus curiae representing the Oregon Newspaper Publishers Association.

O'CONNELL, C. J.

Plaintiff seeks a declaratory judgment holding unconstitutional ORS 260.027 and ORS 260.154 which limit the amounts which may be expended in support of or in opposition to candidates for public office in Oregon. Plaintiff, a candidate for State Representative, who wishes to expend funds on his behalf and to support and oppose the candidacies of others without

regard to the limits imposed by the statutes and regulations, sought to have them declared invalid infringements upon his rights to free expression and equal protection of law guaranteed by the Oregon and federal constitutions. Defendant, as Secretary of State, is charged with the administration of the statutory scheme under attack.

The circuit court entered a decree holding unconstitutional ORS 260.154, which limits the freedom of anyone to expend funds in support or opposition of a candidate without the candidate's consent, but upholding as constitutional ORS 260.027, which limits the amount of expenditures in support of or in opposition to a candidate. Defendant appeals from that part of the decree declaring ORS 260.154 unconstitutional. Plaintiff cross-appeals from that part of the decree declaring ORS 260.027 constitutional.

ORS 260.027 (1) provides as follows:

"(1) No political treasurer or combination of political treasurers shall make or authorize any expenditure that will cause the total amount expended in support of or opposition to a candidate to exceed, with respect to any primary, general or other single election:

"(a) For congressional and state-wide offices, 15 cents times the number of registered voters eligible to vote for the office on the date of the previous general election;

"(b) For all other offices except legislative offices, 25 cents times the number of registered voters eligible to vote for the office on the date of the previous general election or $1,000, whichever is greater; and

"(c) For the offices of State Senator and State Representative, 25 cents times the average number of registered voters on the date of the previous general election in all of the senatorial and representative districts, respectively, in the state."

ORS 260.154 provides:

"(1) No person or political committee shall make expenditures in support of or in opposition to a candidate except the candidate or an opposing candidate. However, a person or political committee may make expenditures in support of a candidate if the consent of the candidate is previously obtained, or in opposition to a candidate if the consent of one or more other candidates for the same office is previously obtained.

"(2) A person or political committee which receives contributions or makes expenditures in support of a single candidate, or in opposition to one or more candidates with the consent of a single candidate, is not subject to ORS 260.035 to 260.162 but such contributions and expenditures are conclusively deemed to be those of the candidate on whose behalf they are made.

"(3) Any person or political committee other than a person or political committee described in subsection (2) of this section which receives contributions or makes expenditures in support of or in opposition to a candidate with his consent or the consent of any opposing candidate is subject to ORS 260.035 to 260.162. All expenditures by any such person or candidate shall also be considered to be contributions to and expenditures by the candidate who has consented to them and shall be reported by the candidate as well as by the person or committee making the expenditures.

"(4) Expenses incurred by a person or political committee on behalf of more than one candidate shall be allocated between such candidates on a reasonable basis.

"(5) Expenses incurred by a political committee, not allocable to any particular candidate or candidates, including expenses incurred in solicitation of funds intended to be contributed to candidates to be designated later, shall not be considered

expenditures in support of a candidate for purposes of subsection (1) of this section or ORS 260.027."

Stated in condensed form, ORS 260.027 imposes a monetary limit upon the total expenditures that can be made in support of or in opposition to a candidate for public office. ORS 260.154 prohibits *any* expenditure in support of or in opposition to a candidate unless the person making the expenditure is a candidate or is acting with the prior consent of the candidate. To enforce these monetary limits, authority to make the expenditures is vested in a "certified political treasurer" who may be the candidate himself or a person designated by the candidate, or the treasurer of a "political committee."[1]

The parties are in agreement that ORS 260.027 and ORS 260.154 are so intertwined in a single legislative scheme for the regulation of campaign expenditures that they must stand or fall together.

It is generally recognized that limits upon candidate expenditures are for the most part unenforceable unless coupled with candidate control over the activities of those who would support him or oppose his rivals. For this reason, we agree with the parties that the legislature intended to enact a single scheme embodied in the two statutes.[2]

■■ We are faced, then, with the initial question of whether the legislature may exercise its authority to regulate the conduct of elections[3] by limiting the

---

[1] ORS 260.027, 260.035-260.037.

[2] *See* ORS 174.040(3).

[3] Unlike the Congress which is dependent for legislative authority upon a constitutional grant, the state legislative power is plenary. Thus state legislation is valid unless contrary to constitutional limitation. Jory v. Martin, 153 Or 278, 285, 56 P2d 1093 (1936).

rights of individual citizens to spend money in an effort to persuade their fellow citizens of the merits or demerits of electoral candidates without violating the prohibitions contained in Article I, §§ 8 and 26 of the Oregon Constitution.[4]

Article I, § 8, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right."

Article I, § 26, provides:

"No law shall be passed restraining any of the inhabitants of the State from assembling together in a peaceable manner to consult for their common good; nor from instructing their Representatives; nor from applying to the Legislature for redress of greviances (sic.)"[5]

If we hold that either of these provisions of the Oregon Constitution is violated by the statutes in question, it would not, then, be necessary to discuss the effect of the federal constitution (First Amendment) because in such case it would not come into play.

---

[4] The amicus brief of Common Cause argues that ORS 260.154 and 260.027 should be construed to regulate "the contributions received and expenditures made by members of their [candidates] official campaign organizations only * * *," thus avoiding the constitutional problems raised if the statutes are construed as limiting all contribution and expenditures. We find no basis for the construction urged by Common Cause. The statutes clearly draw within the regulatory net all those who would make contributions or expenditures for public office, regardless of their connection to a candidate.

[5] The First Amendment to the Constitution of the United States, binding upon the states through the Fourteenth Amendment, similarly provides:

"Congress shall make no law * * * abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

■ Defendant concedes that the statutes restrict freedom of expression but, it is argued, that the restrictions are only "incidental" or "nominal." This is a part of an argument which is predicated upon the theory that freedom of expression and other constitutional freedoms must be balanced against valid legislative objectives and if the latter outweighs the former, the constitution must yield. It is asserted that since the regulation of free speech under the statutes is "merely nominal" as compared to the pressing need to modify our campaign methods by controlling campaign expenditures, the constitutional prohibtions are inapplicable. It is contended that this result can be reached not only under the "balancing test" but also by the application of the "compelling interest" test under which legislation is regarded as valid only to the extent that it is *necessary* to support a compelling governmental interest. Whether logic will permit the proposition that an unqualified constitutional prohibition against laws restraining freedom of expression can be overridden by a law directly restraining freedom of expression is a question we need not examine.[©] Assuming that a process of weighing constitutional interests against legislatively defined interests can be indulged in, we are of the opinion that the public interests served by the adoption of ORS 260.027 and 260.154 are clearly outweighed by the citizen interest protected under Article I, §§ 8 and 26.

---

[©] The amicus curiae brief for the Oregon Newspaper Publishers Association argues that the enactment of such a law would necessarily be incompatible with the constitutional guarantee: "Of necessity the issue must be, to paraphrase the constitutional words, whether the Oregon Legislature in enacting ORS 260.027 and 260.154 has passed a law restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever, or restraining Oregonians from assembling together to consult for their common good, to instruct their Representatives, or to petition for redress of grievances. No intermediate 'tests' are needed, nor are they helpful

We have not overlooked defendant's emphasis upon the evils which have flowed from the unregulated expenditure of campaign funds. Defendant's assertion that "the integrity of government" is imperiled by our present campaign practices is nothing more than a statement of defendant's impression of the magnitude of the evil which attends the uncontrolled expenditure of campaign funds. There is no evidence in this case, nor any data in the studies on campaign expenditures discovered in our research, which would lead to the conclusion that our system of government is imperiled by the free expenditure of funds in political campaigns. Conceding for the purposes of this case that limitation and control of campaign expenditures is of great importance in the catalogue of our social and political needs, the good it proposes to accomplish must be weighed against the danger which it generates in restraining our citizens from freely expressing their views on candidates for public office. In weighing these competing interests, one must recognize the importance of the electorate's liberties of expression of opinion and assembly in the over-all system of government established by our state and federal constitutions. These rights have been termed the "cornerstone of democracy" and so important as to require "breathing space" and protection even from the "chilling effect" of overbroad and ambiguous statutory restrictions. The "classic formulation"[2] of the

insofar as they suggest that if the government can persuade the court of the desirability of its law, the law is constitutional. Legislatures by hypothesis consider the laws they adopt desirable and even necessary. But irrespective of whether judges personally agree or disagree with that legislative judgment, it is the very purpose and function of constitutional limitations to prohibit the enactment of laws that legislators and judges may both deem desirable."

[2] New York Times Co. v. Sullivan, 376 US 254, 270, 84 S Ct 710, 11 L Ed2d 686 (1964).

fundamental nature of freedom of expression in our government was given by Mr. Justice Brandeis in his concurring opinion in *Whitney v. California,* 274 US 357, 375-76, 47 S Ct 641, 71 L Ed 1095, 1105-06 (1927) :

> "Those who won our independence believe that * * * freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

If, as Mr. Justice Brandeis observes, the very structure of our government rests upon freedom of expression, its direct infringement by statute can be justified, if at all, only by purposes rising to the level of importance of the preservation of the government itself.[9] None of the legislative goals put forward by

---

[9] See *Gitlow v. New York,* 268 US 652, 45 S Ct 625, 69 L Ed 1138 (1925).

defendant in support of ORS 260.154 and ORS 260.027, even if they would in fact be served by such a drastic remedy, rise to anything resembling that order of magnitude.

■ First, we cannot accept defendant's view that the prohibition in the statute against expenditures without consent of the candidate constitutes a mere "incidental" or "nominal" restriction on expression. Defendant deems the restriction "nominal" because it does not prohibit "personal appearances, debates, press releases, and other means of discussing issues and communicating with voters." It is difficult to take seriously a contention that these limited outlets for the expression of one's views in a political campaign in this modern day would not seriously impair the opportunity to communicate with the electorate. Even personal appearances, debates, and press releases are not self-generating and if they are to constitute a substantial channel of communication, normally money must be expended to make them come about.

In any event, under the best of circumstances a relatively small fraction of the public can be reached by these limited means and thus the citizen who wishes to carry his message throughout the state is seriously impeded. Moreover, the statutory prohibitions have the practical effect of depriving an advocate of the distinct advantages, including that of greater permanency which the written word in various forms has over the more transient media of personal appearance.

Defendant would have us treat the constitution as permitting the legislature to cancel out these interests in unfettered communication in favor of the public interest in a better system of campaigning for public office. Defendant's argument does little to enlighten us as to the specific evils of uncontrolled campaign expenditures or the specific benefits accruing from

the system designed by ORS chapter 260. The evils associated with Watergate are recited to show the need for renovating campaign expenditure practices. We fail to see how these evils are relevant to the need for controlling campaign expenditures. The "break-in," the bribery, the "wire tap," the use of government servants for private political ends, the "cover up," the various "dirty tricks," and the other moral and legal deviations characterizing "Watergate" had little or nothing to do with the fact that large sums of money were available to a political party.[⊕]

The purpose of ORS 260.027 and ORS 260.154 was not to limit contributions so as to strike at the dangers of politically motivated burglary, or spying, or defamation, or the other Watergate evils, but simply to limit the expenditure of money for communication purposes in a political campaign. The legislation was aimed at the evils deemed to arise from the influential effect of money, both in the influence which money could buy for the contributor and the greater exposure which money could buy for the better financed candidate.

It is argued that "permitting a candidate to saturate the airways and the press with his campaign material can result in his 'buying' an election no less than a candidate who corrupts the election process directly." There is no doubt that the expenditure of money in a campaign may have an influence on the result of the election. However, the importance of money as compared to other factors influencing elections is a question upon which there is a difference of opinion.

[⊕] "The Watergate break-in did not result from the Republicans' having 'too much cash.' While campaign money financed the break-in, the individuals involved did not happen upon the scheme while searching for ways to spend excess cash. The capability and inclination to embark on such undertakings was established independently of the campaign and its supply of money." Winter, *Watergate and The Law,* p 14 (1974) (citation omitted).

The various scholarly studies on campaign financing, although recognizing that money is a signifcant factor, point to other factors having an equal or greater effect on the outcome of elections, including "the predisposition of voters, the issues, group support, incumbency, chances for electoral victory, sympathy on the part of the mass media, and a collection of other factors (religion, divorce, color).[19] Because these latter factors are generally overlooked by the proponents of controlled campaign expenditures, "the importance of money is almost universally exaggerated."[20]

The same is true with respect to defendant's assertion that "the foremost danger of excessive money * * * is the 'buying' of candidates." Here, again, there is a strong conviction by those who have made a study of campaign financing that the buying of candidates through large contributions has not constituted a major evil in elections.[21] For example, Win-

[19] Alexander, "Links and Contrasts Among American Parties and Party Subsystems" in Arnold J. Heidenheimer, ed., *Comparative Political Finance: The Financing of Party Organization and Election Campaigns* (Indianapolis: Heath, D. C. and Co., 1970), pp. 103-104. See also, Winter, *Campaign Financing and Political Freedom*, p. 8 (1973): "For all the heat generated by allegations about private campaign money, there is no body of settled scholarship to support them. No one denies that contributions sometimes play an undesirable or even corrupting role. But no system is without friction and, where the system involves money, whether it be taxation, welfare or campaign contributions, there will be abuses. Contrary to the allegations so widely heard, however, serious scholars are generally in agreement that money is only one factor influencing elections and that its impact is not, on balance, either decisive or harmful."

[20] Winter, *Campaign Financing and Political Freedom*, p. 2 (1973). Winter further observes that "Horror stories illustrating the misuse of campaign money abound; but precisely because they horrify, they may obscure more than they illuminate." *Ibid.* p. 3.

[21] See e.g., A. Heard, *The Costs of Democracy* (1960), p. 6: "And it has been repeatedly demonstrated that he who pays the piper does *not* [his emphasis] always call the tune, at least

ter, *Watergate and The Law*, pp. 9, 14 (1974) characterizes the available evidence as follows:

> "The available evidence does not support the view that money is more than one of a number of factors affecting the electoral process or that it exclusively supports a narrow range of ideas on public policy. * * * * *
>
> "Matched against this array of respected scholarship, is little more than the impressionistic assertion that some kind of 'correlation' exists between legislative or executive decisions and campaign contributions. To this it may be said that since contributions are rarely given at random or to one's political enemies, the existence of this

not in politics. Politicians prize votes more than dollars.

"Contrary to frequent assertions, American campaign monies are *not* [his emphasis] supplied solely by a small handful of fat cats. Millions of people now give to politics. Even those who give several hundred dollars each number in the tens of thousands.

"And the traditional fat cats are *not* [his emphasis] all of one species, allied against common adversaries. Big givers show up importantly in both parties and on behalf of many opposing candidates." As quoted in Penniman and Winter, *Campaign Finances—Two Views of the Political and Constitutional Implications*, p. 20 (1971); D. Adamany, *Financing Politics: Recent Wisconsin Elections* pp. 231-233 (1969).

"* * * May not those who contribute or raise money in large amounts thereby gain influence not available to others? Aware that the answer to this question is not a simple one, we would say, 'Yes, but not overly much.' What contributors or fund raisers (the financial middlemen) get to begin with is access to centers of decision-making. Control over money certainly makes it easier to get in and present one's case. Men of wealth, however, are likely to have substantial economic interests which would provide them with good access whether or not they make contributions. If no significant interest feels disadvantaged by what these contributors want, they may well be given the benefit of the doubt. But in matters of great moment, where the varied interests in our society are in contention, it is doubtful whether control over money goes very far with a President." N. Polsby and A. Wildavsky, *Presidential Elections: Strategies of American Electoral Politics*, pp. 39-40 (2d ed. 1968).

*See also,* Bottomly, Corrupt Practices in Political Campaigns, 30 B U L Rev 331, 369-370 (1950); The Brookings Institution, *Paying for Politics,* p. 7 (Brookings Research Report 125, 1972).

correlation is no answer to the conclusions given here. If anything, the fact that conservatives support conservative causes or candidates, or that liberals support liberal causes or candidates, suggests that the candidate and causes create [attract] the money, and not the other way round."

Assuming that the "purchasing" of elections and candidates by wealthy contributors is such an evil, there is still the question of whether a limitation on expenditures would serve in any significant way to eradicate the evil. In a study sponsored by the American Enterprise Institute for Public Policy Research, the view is taken that "limiting the use of private money in election campaigns will hardly decrease the influence of affluent people, for direct access to resources easily converted to political purposes is concentrated among various sectors of the well-to-do." The study goes on to observe that "[w]hile the power of those who rely on contributions will decline, that of at least three groups in society will be increased: (1) pressure groups which operate 'issue' (rather than 'political') campaigns; (2) political activists with free time, and (3) those who control the media. All three, however, represent wealth in one form or another."[20]

Defendant does not press the contention made in the amicus curiae brief of Common Cause that limitations on campaign expenditures can be justified

---

[20] Winter, *Campaign Financing and Political Freedom,* p. 11 (1973). In addition, it should be noted that the truly outrageous examples of the sale of political favor in recent times have been illegal on other grounds and have been totally outside the system of political contributions and expenditures which these statutes seek to regulate. Spiro Agnew's receipt of regular bribes from Maryland contractors, for example, lends no support for the regulation of political expression because the money was never intended by either its donors or the recipient to be used for political purposes, and would thus fall outside the scope of such statutes. The same is true of other notorious instances of purchasing political influence such as Teapot Dome, etc.

on the ground that they help to equalize the advantages between candidates. However, in weighing the good and the evil in a scheme of limiting campaign expenditures, we cannot overlook the fact that such limitations favor candidates with familiar names, incumbents, and those with leisure time.[19]

■ Overarching all of the foregoing considerations is the inescapable fact that the limiting legislation closes or impedes important channels of communication on public issues and thus denies citizens freedom of expression where the protection of that constitutional right is the most necessary to preserve our system of government.

Defendant asks us to cast this constitutional protection aside to meet alleged evils which are described in broad generalities and unsupported by reliable evidence. The interests described in Article I were not intended to be swept away by this kind of speculation.

Defendant points to several U. S. Supreme Court cases which, it is contended, are support for the view that limitations on political campaign contributions and expenditures have been held to meet federal constitutional requirements where governmental interests of no higher order than those served in the present case were involved.[20]

---

[19] Winter, *Watergate and The Law,* pp. 11, 21 (1974).

[20] Burroughs v. United States, 290 US 534, 54 S Ct 287, 78 L Ed 484 (1933) (holding that the Federal Corrupt Practices Act of 1925, which limited expenditures by candidates and prohibited contributions by corporations was within the power of Congress and not reserved to the states by Art. II, § 1 of the U. S. Constitution); Pipefitters Local Union No. 562 v. United States, 407 US 385, 92 S Ct 2247, 33 L Ed2d 11 (1972) (*impliedly* upholding federal prohibition of political contributions by union from funds *involuntarily* contributed by members); United States Civil Service Commission v. National Association of Letter Carriers, 413 US 548, 93 S Ct 2880, 37 L Ed2d 796 (1973) (holding Congress

Plaintiff counters with the argument that the cases relied upon are distinguishable from the case at bar on various grounds, principally because the federal legislation does not directly proscribe the means of expression as the Oregon statutes do but limits expression merely as an incident to the preservation of some other legitimate interest of society.[9]

can constitutionally forbid federal employees from engaging in acts of political management and campaigning); and Broadrick v. Oklahoma, 413 US 601, 93 S Ct 2908, 37 L Ed2d 830 (1973) (holding political activities of state employees are constitutionally subject to state regulation).

[9] The brief of amicus curiae for the Oregon Newspaper Publishers Association distinguishes the U. S. Supreme Court cases from the present case as follows: "Burroughs and Cannon v. United States, 290 U.S. 534 (1933), held that enactment of the Federal Corrupt Practices Act of 1925 was within the delegated powers of Congress; it did not deal with the First Amendment claims at issue here. A number of cases deal with laws that are designed to insulate from political influence certain kinds of persons, e.g. civil service employees, United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548 (1973); Broadrick v. Oklahoma, 413 U.S. 601 (1973), or certain kinds of sources of funds, e.g. union dues, see Pipefitters Local Union No. 562 v. United States, 407 U.S. 385 (1972), or corporations, regulated utilities, or banks, see, e.g., United States v. First National Bank of Cincinnati, 329 F. Supp. 1251 (1971). In cases like these, not only must the distinction be kept in mind between *expenditures* made on expressing a political position and political *contributions* to be used by the recipient however he chooses; they also hinge on the characteristics and roles of particular donors. Thus, whatever one thinks of the Hatch Act sustained in *Letter Carriers, supra,* the decision holds only that government can require civil servants to refrain from active politics while in the civil service as one of the obligations of government employment. Its premise is that civil servants should carry out the political views of elected policy makers, not their own * * *."

It is also significant that in each of the cases which have upheld direct limitations upon political activity because of its political content, the regulation was directed either to an economic entity or to a particular class of individuals rather than to individuals. In at least two of these cases the Supreme Court denied that similar restrictions upon the political activities of *individuals* would be permitted under the First Amendment. In

■ We do not need to decide whether the U. S. Supreme Court decisions can be so distinguished from the one before us. The cases relied upon by defendant were tested under the federal constitution which, as we have already noted, is not controlling where this court is of the opinion that our constitution should provide a larger measure of protection to the citizen.⑰

■ In addition, it is now well established that not even a compelling state interest in the regulation of the non-communicative aspects of expression can justify infringement of fundamental rights when less drastic means to the desired end are available. *Shelton v. Tucker,* 364 US 479, 81 S Ct 247, 5 L Ed2d 231 (1960). For example, the evils sought to be reached by ORS 260.027 and ORS 260.154 could be treated by providing some form of public subsidy for campaign expenditures.⑱ In the words of Mr. Justice Brandeis:

"* * * If there be time to expose through dis-

---

Pipefitters Local Union No. 562 v. United States, *supra* 407 US 385, it was noted that unions may still make donations out of segregated funds created by voluntary contributions of their members. And in Broadrick v. Oklahoma, *supra* 413 US 601, 616, the court expressly stated that the activities of state employees which were constitutionally subject to regulation by the states, "if engaged in by private persons would plainly be protected by the First and Fourteenth Amendments."

⑰ This would be true even if our constitution contained the same language as the federal constitution. The difference in the language of the Oregon and federal constitutions may also be pointed to as indicating an intention to provide a larger measure of protection to free expression under the Oregon Constitution. The California Constitution, which contains language similar to Oregon Constitution, Art. I, § 8, was so construed in Wilson v. Superior Court of Los Angeles County, 119 Cal Rptr 468, 532 P2d 116, 120 (1975), where the court said: "A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press."

⑱ *See,* D. Adamany, *Campaign Finance in America,* pp. 232-233 (1972). The statement in text should not be taken as an expression of an opinion as to the effectiveness of public subsidy or its desirability, but only that it is likely to be at least as ef-

cussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." *Whitney v. California, supra* 274 US 357, 377 (1927) (Brandeis, J., concurring).

In disposing of defendant's contentions predicated upon balancing legislative objectives against the constitutional guarantees of Art. I, our detailed examination of the effect of the uncontrolled expenditure of funds in political campaigns has, perhaps, obscured the emphasis we intend to make in disposing of this case.

Our apparent preoccupation with the comparison of the good and bad effects of the statutes in question is not to be taken as the recognition of a principle that proof of desirable and needful legislation is enough to override constitutional mandates. As we said at the outset, it is possible that sound analysis in the interpretation of constitutions does not permit any balancing whatsoever between a constitutional provision and a statute which directly impinges upon it. But, as we have demonstrated, even accepting the balancing test as sound, the evidence adduced by defendant to show the need for the limiting statutes is so unsubstantial that his own test is not met.

■ Plaintiff further cross-appeals from the trial court's refusal to award him attorney's fees. Although plaintiff concedes that as a general rule American courts will not award attorney's fees to the prevailing

fective as direct restrictions and is less clearly subject to constitutional attack.

For discussion of various subsidy proposals, see H. Wells, *Government Financing of Political Parties in Puerto Rico* (1961); H. Wells & R. Anderson, *Government Financing of Political Parties in Puerto Rico:* A Supplement to Study Number Four (1966); Penniman & Winter, *Campaign Finances,* pp. 25-32, 69-70 (1971); Winter, *Watergate and The Law,* pp. 29-34 (1974).

party absent authorization of statute or contract, he correctly points out that courts of equity have the inherent power to award attorney's fees. This power frequently has been exercised in cases where the plaintiff brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own.[19] We recognized this equitable exception to the general rule in *Gilbert v. Hoisting & Port. Engrs.,* 237 Or 130, 384 P2d 136, 390 P2d 320, *Cert. denied* 376 US 963 84 S Ct 1125, 11 L Ed2d 981 (1964),[20] a substantially similar case to the one at hand. In *Gilbert,* the plaintiffs sued the union of which they were members to require fair and democratic elections. We allowed the plaintiffs attorney's fees at both trial and appellate levels because

> "* * * The preservation of the democratic process in the functioning of unions is a matter of· primary concern, not only to union members but to the public as well. * * * Those members of the union who in good faith seek to preserve the internal democracy of their union should not have to bear the expense of a successful suit." 237 Or at 138.

■ It is beyond dispute that the interest of the public in preservation of the individual liberties guaranteed against governmental infringement of the constitution is even stronger than that present in *Gilbert.* Correspondingly, plaintiff in this case, at least as much as the plaintiffs in *Gilbert,* should not be required to bear the entire cost of this litigation the benefits of which flow equally to all members of the public. Therefore, the case must be remanded for the

---

[19] *See,* Falcon, Award of Attorney's Fees in Civil Rights and Constitutional Litigation, 33 Md L Rev 379 (1973); Nussbaum, Attorney's Fees in Public Interest Litigation, 48 N Y U L Rev 301 (1973); Note, 24 Hastings L J 733 (1973).

[20] *See also,* Hall v. Cole, 412 US 1, 93 S Ct 1943, 36 L Ed2d 702 (1973).

determination and award of reasonable attorney's fees.

We hold ORS 260.027 and ORS 260.154 violate the prohibition of Article I of the Oregon Constitution and are void. Therefore, that portion of the decree holding ORS 260.027 constitutional is reversed, and that portion holding ORS 260.154 unconstitutional is affirmed. The case is remanded for determination of plaintiff's reasonable attorney's fees.

Affirmed in part, reversed in part and remanded.

TONGUE, J., specially concurring.

I agree with the result reached by the majority, but not with all of the statements made by it in its application of the "balancing test" to the constitutional issues presented in this case.

In the application of that test the majority relies not so much upon previous decisions by courts and upon recognized texts on constitutional law as upon statements made by the authors of various books and treatises on politics, campaign financing and related subjects. Upon the basis of such authorities the majority seemingly subscribes to the following propositions, among others:

"* * * the buying of candidates through large contributions has not constituted a major evil in elections"

and

"* * * The 'break-in,' the bribery, the 'wire tap,' the use of government servants for private political ends, the 'cover up,' the various 'dirty tricks,' and the other moral and legal deviations characterizing 'Watergate' had little or nothing to do with the fact that large sums of money were available to a political party."

I cannot subscribe to these propositions. The fact that large campaign contributions may not com-

pletely "buy" most candidates is not sufficient, in my opinion, to remove the taint of improper influence. And the large sums of money not subject to any public accounting provided the means for much of the attempted "cover up" which was perhaps the greatest shame of Watergate.

In my opinion, the result reached by the majority is inescapable without the necessity of embarking upon a discussion of the question whether, as stated by the majority, "assuming that the 'purchasing' of elections and candidates by wealthy contributors is such an evil," a "limitation on expenditures would serve in any significant way to eradicate the evil."

Under the terms of ORS 260.154 no citizen would be permitted to even buy post cards and stamps to mail to his friends, to his customers or clients, or to others in the same occupation, business, church or other organization in support of or opposition to a candidate unless the consent of a candidate has first been obtained. Clearly, this is an invalid limitation upon the constitutional right of freedom of expression and one that cannot be justified as "nominal" or "incidental."

As stated by the majority, "the parties are in agreement that ORS 260.027 and ORS 260.154 are so intertwined in a single legislative scheme for the regulation of campaign expenditures that they must stand or fall together."

It follows from this agreement by the parties that because ORS 260.154 is invalid we must also invalidate ORS 260.027 as part of that "single legislative scheme." It does not necessarily follow, however, at least in my opinion, that the legislature may impose no regulations, restrictions, or limitations upon the financing of political campaigns.