DAVIDSON, *Appellant,*
*v.*
ROGERS et al, *Respondents.*
(No. 77 1804, SC 25266)
574 P2d 624

William F. Frye, of Frye, Speer & Smith, Eugene, argued the cause and filed a brief for appellant.

Randall E. Thwing, of Thwing, Atherly & Butler, Eugene, argued the cause and filed a brief for respondents.

Before Denecke, Chief Justice, Holman, Tongue, Bryson, Lent and Linde, Justices, and Gillette, Justice Pro Tempore.

HOLMAN, J.

Linde, J., concurred and filed opinion in which Gillette, Justice Pro Tempore, joined.

Lent, J., dissented and filed opinion in which Tongue, Justice, joined.

## HOLMAN, J.

Plaintiff brought an action for libel based upon a magazine article published by defendants.[1] Only general damages were requested. Defendants' demurrer to the complaint was sustained upon the basis that the facts stated were insufficient to constitute a cause of action for *general damages* because it was not alleged that a retraction had been requested of defendants and refused by them as required by ORS 30.160.[2] Plaintiff appeals.

Plaintiff concedes that under our present decision in *Holden v. Pioneer Broadcasting Co. et al,* 228 Or 405, 365 P2d 845 (1961) he cannot maintain his action. However, he urges us to reconsider that decision and to hold that the statute is unconstitutional as being in violation of that part of Art. I, § 10, of the Oregon Constitution which provides that "* * * every man shall have remedy by due course of law for injury done him in his person, property or reputation."

We see no reason to depart from this court's prior decision upon the subject. The language of the constitution does not specify that the remedy need be the same as was available at common law at the time of the adoption of the constitution; and the statute, while restricting the remedy, does not abolish the cause of action. Even though a retraction is not requested, the

---

[1] Plaintiff also included a count for invasion of privacy, but this issue is not addressed in his brief and has not been considered.

[2] ORS 30.160. "(1) In an action for damages on account of a defamatory statement published or broadcast in a newspaper, magazine, other printed periodical, or by radio, television or motion pictures, the plaintiff shall not recover *general damages* unless:

"(a) A correction or retraction is demanded but not published as provided in ORS 30.165; or

"(b) The plaintiff proves by a preponderance of the evidence that the defendant actually intended to defame the plaintiff.

"(2) Where the plaintiff is entitled to recover general damages, the publication of a correction or retraction may be considered in mitigation of damages." (Emphasis ours.)

[ 221 ]

right of action still exists for an intentional defamation and, in any event, for recovery of specific demonstrable economic loss. Such a limitation is not violative of Art. I, § 10, for the reason that it does not wholly deny the injured party a remedy for the wrong suffered. *Holden v. Pioneer Broadcasting Co. et al, supra* at 412; *Noonan v. City of Portland,* 161 Or 213, 244, 88 P2d 808 (1939); *Pullen v. Eugene,* 77 Or 320, 328, 146 P 822, 147 P 768, 147 P 1191, 151 P 474, Ann Cas 1917B 933 (1915).

In addition, the legislature has made available a retraction as a substitute for the remedy which the law would otherwise have provided. *Holden v. Pioneer Broadcasting Co. et al, supra* at 415. As a practical matter, retraction can come nearer to restoring an injured reputation than can money, although neither can completely restore it.

If the specific remedies available at common law were frozen at the adoption of Oregon's Constitution, the legislature would have been helpless to enact limitations upon actions such as those provided by the Workmen's Compensation Law and the guest passenger statute, or to concern itself with other similar matters about which it is usual for legislatures to take action.

The judgment of the trial court is affirmed.

**LINDE, J.,** concurring.

In joining the court's opinion I do not endorse everything that was said in *Holden v. Pioneer Broadcasting Co.,* 228 Or 405, 365 P2d 845 (1961). Some of the points made by the dissenters in that case and by Justice Lent today are well taken. But I think the question whether retraction of a defamatory statement is an "alternative remedy" that can satisfy article I, section 10, was and remains a false issue.

The guarantee in article I, section 10, of a "remedy by due course of law for injury done [one] in his person,

property, or reputation" is part of a section dealing with the administration of justice.[1] It is a plaintiffs' clause, addressed to securing the right to set the machinery of the law in motion to recover for harm already done to one of the stated kinds of interest, a guarantee that dates by way of the original state constitutions of 1776 back to King John's promise in Magna Charta chapter 40: "To no one will We sell, to no one will We deny or delay, right or justice."[2] It is concerned with securing a remedy from those who administer the law, through courts or otherwise. But ORS 30.160 and 30.165 do not purport to entitle anyone to the "remedy" of a retraction. Indeed, if they

---

[1] Article I, section 10, provides:

> No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation.—

[2] *See* Sources of Our Liberties 145, 342, 348 (R. Perry ed 1959); A. E. Howard, The Road From Runnymede 210, 284-297, 483-484 (1968). As a claim to a remedy *provided by* the government, this section should not be confused with the guarantee of Magna Charta chapter 39 *against deprivations* by the government "except by the lawful judgment of [one's] peers and by the law of the land," which gave us the "law of the land" and "due process" clauses of our 18th century constitutions. Several of these constitutions contained both of these distinct guarantees. For instance, the first constitution of Maryland in 1776 declared in one paragraph:

> That every freeman, for any injury done him in his person or property, ought to have remedy, by the course of the law of the land, and ought to have justice and right freely without sale, fully without any denial, and speedily without delay, according to the law of the land.

and in another:

> That no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land. Md. Decl. of Rights §§ XVII, XXI (1776).

*See also* Pa. Const. art IX, §§ 9, 11 (1790), Del. Const. art I, §§ 7, 9 (1792), Ky. Const. art XII, §§ 10, 13 (1792). Other states adopted only one or the other, as did the precursors of Oregon's version of Magna Charta chapter 40 stated in article I, section 10. A century earlier William Penn had included the equivalent of Magna Charta chapter 40 in his Frame of Government for Pennsylvania (see the Laws Agreed Upon in England art. V (1682) reprinted in B. Schwartz, The Bill of Rights: A Documentary History 140 (1971)), and New York include both it and a version of chapter 39 in its Charter of Libertyes and Priviledges (1683). B. Schwartz *supra* at 165.

did, they really would raise genuine constitutional difficulties. *See Miami Herald Publishing Co. v. Tornillo,* 418 US 241 (1974). These sections merely provide the publisher of the alleged defamation with an opportunity to retract if he wishes by this means to limit his possible liability. A step taken by a putative defendant which the law does not compel but leaves entirely to his own balance between his sense of innocence or stubbornness on the one hand and his sense of obligation or calculation of risk on the other is not a "remedy by due course of law." If an optional retraction plays a role at all in the validity of limiting the measure of damages for defamation, it would have to be that the retraction is deemed to reduce the "injury," not that it is a substitute legal remedy.

But the validity of ORS 30.160 does not rest on the contingency of a retraction. The statute does not withdraw the common-law action for defamation. It limits the financial scope of the remedy, at least for unintentional defamation, to a measure of damages that corresponds to injuries measurable in money.

We need not pursue here the question how far the legislature must retain money damages as a constitutionally required remedy for noneconomic injuries when they existed at common law. Defamation is a special case, addressed by more than one provision of article I, Oregon's Bill of Rights. The focus of section 10 is on assuring a remedy to one whose reputation has been injured. At the same time, article I, section 8, forbids all laws "restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever," with the proviso that "every person shall be responsible for the abuse of this right." The two sections must be construed together. They yield a coherent view of freedom and responsibility. The responsibility prescribed in section 8 is responsibility to others for injuries done to them, such as the injury to reputation accorded constitutional stature in section 10. Laws limited to remedying such injuries alone are not laws restraining the free

expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever. Laws that in terms impose sanctions on speech or writing beyond the needs of remedying such injuries, whether statutory or common law, are restraints and restrictions forbidden by section 8. *See Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975). Given the interrelation of our two explicit sections on freedom of speech and press and the right to a remedy for injury to reputation, a statute that matches financial compensation for unintentional defamation to demonstrable injuries measurable in money arguably exhausts the scope of that remedy under article I, section 8. In any event, it satisfies article I, section 10.

Gillette, J., pro tem., joins in this concurring opinion.

**LENT, J.,** dissenting.

The sole issue presented upon appeal is whether the decision of this court rendered in *Holden v. Pioneer Broadcasting Co. et al,* 228 Or 405, 365 P2d 845 (1961), should be overruled insofar as it held ORS 30.155 to ORS 30.175, inclusive, to be impervious to constitutional attack upon the basis of Oregon Constitution Art I, § 10.[1] I believed *Holden* was decided erroneously in 1961 and am still of the same belief. It follows that I must respectfully dissent.

The concept that those who defame others should be held accountable is neither new nor peculiar to Anglo-American jurisprudence. History discloses that publishers of libels in ancient Greece and Rome were held accountable for their excesses. Although he was chiefly concerned with an attack upon the infamous "Printing Ordinance" of June 1643,[2] John Milton, in his

---

[1] In *Holden* the constitutionality of the law was upheld, not only under Oregon Constitution, Art I, § 10, but also under Oregon Constitution, Art I, §§ 8 and 20, "and under the due process and equal protection clauses of the fourteenth amendment to the federal constitution." 228 Or at 409.

[2] The ordinance was an instrument of censorship and prior restraint of speech through its requirement that all publications before being issued be licensed and registered in the records of the "Stationers' Company."

"Areopagitica," in November 1644 had occasion to refer to this historic accountability.

"* * * * *

"In *Athens* where Books and Wits were ever busier then in any other part of *Greece,* I finde but only two sorts of writings which the Magistrate car'd to take notice of; those either blasphemous and Atheisticall, or Libellous. Thus the Books of *Protagoras* were by the Judges of *Areopagus* commanded to be burnt, and himselfe banisht the territory for a discourse begun with his confessing not to know *whether there were gods, or whether not*: And against defaming, it was decreed that none should be traduc'd by name, as was the manner of *Vetus Comoedia,* whereby we may guesse how they censur'd libelling: And this course was quick enough, as *Cicero* writes, to quell both the desperate wits of other Atheists, and the open way of defaming, as the event shew'd. * * *

"* * * * *

"And yet at the same time *Naevius* and *Plautus* the first Latine comedians had fill'd the City with all the borrow'd Scenes of *Menander* and *Philemon.* Then began to be consider'd there also what was to be don to libellous books and Authors; for *Naevius* was quickly cast into prison for his unbridl'd pen, and releas'd by the *Tribunes* upon his recantation: We read also that libels were burnt, and the makers punisht by *Augustus.* The like severity no doubt was us'd if ought were impiously writt'n against their esteemed gods. Except in these two points, how the world went in Books, the Magistrat kept no reckoning. * * *

"* * * * *

"And as for regulating the Presse, let no man think to have the honour of advising ye better then your selves have done in that Order publisht next before this, that no book be Printed, unlesse the Printers and the Authors name, or at least the Printers be register'd. Those which otherwise come forth, if they be found mischievous and libellous, the fire and the executioner will be the timeliest and most effectuall remedy, that mans prevention can use. * * *"

"* * * * *" *Areopagitica, A Speech for the Liberty of Unlicenc'd Printing,* as found in *The Tradition of Freedom,* 1957.

[ 226 ]

Nor does it hurt to remind ourselves that the value of reputation is generally recognized in our culture as well as in our jurisprudence:

"A good name is rather to be chosen than great riches." [Proverbs 22:1]

"I would to God thou and I knew where a commodity of good names were to be bought." [Shakespeare: *I Henry IV* I.ii.]

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed."

[Shakespeare: *Othello* III, iii.] Dictionary of Quotations, Bergen Evans, Delacorte Press 1968, p 284.

In American jurisprudence the judicial preservation of constitutionally mandated accountability for libel is well described by the Michigan court:

"There is no room for holding in a constitutional system that private reputation is any more subject to be removed by statute from full legal protection than life, liberty, or property. It is one of those rights, necessary to human society that underlie the whole social scheme of civilization. * * *.

"* * * * *

"It is not competent for the Legislature to give one class of citizens legal exemptions from liability for wrongs not granted to others; and it is not competent to authorize any person, natural or artificial, to do wrong to others without answering fully for the wrong * * *." *Park v. Free Press Co.,* 72 Mich 560, 566-67, 40 NW 731 (1888).

Some background concerning the statute in *Holden* may be of assistance to the reader in understanding why both the majority opinion and this dissent are relatively short when the issue is so important. What was (and is) codified as ORS 30.155 through ORS 30.175 was enacted in 1955, Oregon Laws 1955, ch.

365. The law was commonly (but definitely not popularly) called by its opponents "The License to Libel." Outright repeal of the law was sought in the 1957 session of the legislature by the introduction of Senate Bill No. 4. The Committee on Judiciary of the Senate took a middle position, which would have permitted a defamed person to recover both general and special damages directly resulting from the defamation. Additionally, the defamed person could recover punitive damages if he could prove that the publisher "wilfully or recklessly" published the defamation. On the other hand, the injured party would be limited to special damages *where the publisher proved* that he neither intended the defamation nor was it the result of his negligence, *and further proved* that he had corrected or retracted the alleged defamatory material within a specified manner and time. Whether the person defamed had demanded a correction or retraction was made relevant in determining the amount to be allowed for general and punitive damages. The trier of fact would also have been permitted to consider the extent and efficacy of correction or retraction in fixing general and punitive damages, whether the libel was intentional or the result of negligence.

It is apparent, of course, that this was a rewriting of the 1955 law by the 1957 Senate Judiciary Committee, which would have resulted in some modification of the almost absolute immunity to publishers granted by the 1955 law. In the House the proponents of outright repeal were so confident that the 1955 law would be delcared unconstitutional, however, that they rejected the substitute which passed the Senate. As a result, the bill died in committee in the House.

*Holden* was decided by a sharply divided court in a four-to-three decision.[3] Justice O'Connell authored the

---

[3] One of the majority of the *Holden* court was, in effect, sitting *pro tempore.* The Hon. Hall S. Lusk, a retired justice, had been "[r]ecalled to temporary active service." 228 Or at ii. This is not mentioned to disparage Justice Lusk's capabilities, for he had an outstanding legal mind and was certainly one of the strongest members ever of this court. I do mention it to accentuate the fact that less than a majority of the then regular members of this court upheld the constitutionality of the law.

13-page opinion of the court. Justice Goodwin (joined by Justices Warner and Sloan) wrote a 15-page dissent, and Justice Sloan (joined by Justice Goodwin) added a 16-page dissent. I point to the length of the dissents only to emphasize these were not merely *pro forma* remonstrances.

No justice presently a regular member of this court or before whom this case is heard was on the *Holden* court.[4] Neither Justice Holman for the majority nor I in this dissent have chosen to rehash the opinions of the *Holden* court. I acknowledge I cannot state the position for unconstitutionality better than did the *Holden* dissenters.[5] To reword their thought and thereby to iterate it in the official report of the case at bar should not be necessary to this attempt to persuade my brothers that the dissent has the better of the conflict. I forego iteration of the thought of the *Holden* dissenters only in the firm belief that I am entitled to assume that the members of the majority of the present court have not cast their ballot for constitutionality without first carefully reading all three opinions of the *Holden* court. I assume that like considerations have been, at least in part, responsible for the brevity of Justice Holman's opinion for the majority.

Before proceeding to the specific bases for the *Holden* opinion, I would point out its concession that it was taking an overwhelmingly minority position among courts which had had occasion to pass upon the validity of similar legislation.

> "The constitutionality of statutes of a similar nature has been passed upon in other states. In a majority of the cases in which the question has been raised the courts have held, or stated in dicta, that the denial of the

---

[4]Present Chief Justice Denecke, however, was the trial judge whose decision was affirmed in *Holden,* and this writer was an attorney of record and on the brief for the losing plaintiff-appellant.

[5]I do not fully approve the treatment by the dissent of Art I, § 10, as a "due process" clause. What they had to say in that respect, however, could just as well have been couched in terms of "remedy by due course of law for injury * * * [to one's] reputation."

remedy of general damages for defamation is unconstitutional. The contrary view is taken in *Allen v. Pioneer Press Co.,* 40 Minn 117, 41 NW 936 (1889) and *Werner v. Southern California Associated Newspapers,* 35 Cal2d 121, 216 P2d 825, 13 ALR2d 277 (1950), appeal dismissed, 340 US 910, 71 S Ct 290, 95 L Ed 657 (1951). The cases are collected in 13 ALR2d 277." 228 Or 410.

The dissenters found eleven[6] jurisdictions which had either declared such statutes unconstitutional or had saved their constitutionality by construing them to allow recovery of general damages despite legislative attempts to restrict the plaintiff to "actual damages" or similarly named categories of damages. It does not appear that the split of authority has quantitatively changed except for the *Holden* decision since the annotation appearing at 13 ALR2d 277. *See* Later Case Service.

Since the majority opinion, in effect, says nothing more than that *Holden* was decided rightly, I propose to state briefly what I conceive to be error in both cases.

Both majority opinions assert that Art I, § 10, does not freeze the law or the remedy for the injury as of the time of the adoption of the Constitution. With that general proposition I have no disagreement. With its

---

[6] *Moore v. Stevenson,* 27 Conn 14 (1858); *Park v. Free Press Co.,* 72 Mich 560, 40 NW 731 (1888); *Hanson v. Krehbiel,* 68 Kan 670, 75 P 1041 (1904); *Osborn v. Leach,* 135 NC 628, 47 SE 811 (1904); *Neafie v. Hoboken Printing & Pub. Co.,* 75 NJL 564, 68 A 146 (1907); *Byers v. Meridian Ptg. Co.,* 84 Ohio St 408, 95 NE 917 (1911); *Comer v. Age Herald Publishing Co.,* 151 Ala 613, 44 So 673 (1907); *Ellis v. Brockton Publishing Co.,* 198 Mass 538, 84 NE 1018 (1908); *Meyerle v. Pioneer Pub. Co.,* 45 ND 568, 178 NW 792 (1920); *Ross v. Gore,* 48 So2d 412 (Florida 1950). *See also Hotchkiss v. Porter,* 30 Conn 414 (1862). *See also Post Pub. Co. v. Butler,* 137 Fed 723 (6th Cir 1905), in which the court held that an Ohio statute barring recovery for loss of reputation upon unilateral retraction would be unconstitutional and then construed the statute to bar such recovery only in case of an actual request for retraction by the defamed person. The court there thought that an actual request would constitute a waiver of the constitutional right to seek damages.

It seems, therefore, that until 1950 Minnesota stood alone. As I shall develop later, Minnesota should not properly be considered as standing for the minority view embraced in *Holden.*

application to uphold this particular legislation I must disagree. The majorities in *Holden* and here say that the legislature can properly substitute the *publisher's option to retract* for the defamed person's remedy at the courthouse. That the legislature might well make such a substitution absent constitutional restriction is manifest. In *Holden* the majority found, however, that the legislature could make that substitution in the face of Art I, § 10, because some commentators, the Minnesota and California courts, and, obviously, the Oregon Legislature believed the publisher's option to retract was as efficacious as the constitutionally guaranteed right to compensatory damages:

> "* * * It cannot be said that the legislature had no foundation for concluding that retraction was an adequate substitute for general damages." 228 Or 416.

The quoted material may be interestingly compared with another expression appearing earlier in the same paragraph:

> "* * * The harm to a plaintiff is likely to be irreparable either by way of money recovery or through retraction. It is a *pure speculation* to say that the one remedy is more reparable than the other. * * *" 228 Or 416. (Emphasis added).

Does "pure speculation" afford a valid basis for the statutory substitution for *the remedy* "by due course of law" for injury to reputation known to those who adopted the Oregon Constitution almost a century before passage of this statute? More importantly, is it "due course of law"? The *Holden* dissenters well answered the last question as follows:

> "The meaning of due course of law was explained by Daniel Webster in his celebrated argument in *Dartmouth College v. Woodward,* 17 US (4 Wheaton) 518, 581, 4 L Ed 629:
>
> " ' * * * By the law of the land, is most clearly intended, the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. * * * If this were [not] so, acts of attainder, bills of pains and penalties, acts

of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures, in all possible forms, would be the law of the land * * *.'

The principles found in the *Dartmouth College* case are relied upon in *Hanson v. Krehbiel,* 68 Kan 670, 75 P 1041, 64 LRA 790. And see the discussion in 2 Cooley, Constitutional Limitations, supra, 733-741, and *Griffin v. Mixon,* 38 Miss 424, supra.

"The retraction statute affords the plaintiff no individual hearing or trial to determine the adequacy of a remedy in any case. Whether the retraction has restored a reputation or further beclouded it remains a mystery. The 'remedy' rather operates automatically to close the doors of the court. The legislature has arbitrarily declared that a decision to retract, rendered by the tortfeasor, shall be the exclusive remedy. The retraction is not 'given' by the statute; it is merely converted from a defense in mitigation to a defense in bar." 228 Or 423, 424.

The *Holden* majority held that the statute did not violate Art I, § 10, on the basis of "two excellent opinions":[7] *Werner v. Southern California Associated Newspapers,* 35 Cal2d 121, 216 P2d 825 (1950), *appeal dismissed,* 340 US 910 (1951); and *Allen v. Pioneer Press Co.,* 40 Minn 117, 41 NW 936 (1889).

"* * * Although the statutes and constitutional provisions dealt with in the *Werner* and *Allen* cases are not precisely the same as ours, the basic constitutional problems presented are the same. [footnote omitted] We agree with the courts' analysis in these cases and adopt it as dispositive of the case at bar." 228 Or 411.

That the *Holden* majority could find those two cases to be dispositive can best be described as curious.

When *Allen* is read together with the later Minnesota case, *Thorson v. Albert Lea Publishing Co.,* 190 Minn 200, 215 NW 177 (1933), it is readily apparent

[7] This is a clear case of beauty lying in the eye of the beholder. The opinions are excellent if one agrees with them. They are better described in less laudatory language if one disagrees with them, as did the dissenters in the California case. *Werner v. Southern California Associated Newspapers,* 35 Cal2d 121, 137 (Carter, J, dissenting), and 150 (Schauer, J, dissenting).

that judicial construction of the Minnesota statute is all that saved it from being declared unconstitutional. The Minnesota statute allowed recovery of general damages even if a retraction had been published *unless the defendant proved* that the libel was published in good faith and under an honest mistake as to the facts; moreover, the Minnesota court interpreted "good faith" to mean freedom from all fault, including negligence. Since neither the majority in *Holden* nor in the case at bar has indicated that the judicial construction of its statute by the Minnesota court is other than I have here set forth, I deem any further argument as to the inapposition of the Minnesota decisions to be superfluous.

Insofar as the *Holden* majority's reliance on *Werner* is concerned, I must borrow from Lewis Carroll's *Alice's Adventures in Wonderland*: "Curiouser and curiouser!"

As Justice O'Connell conceded, the California constitutional provision was "not precisely the same as ours." Art I, § 9, of the California Constitution, as quoted in *Werner,* provides:

" 'Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press . . . .' " 35 Cal2d 124.

This provision of the California Constitution might fairly be considered comparable to Oregon Constitution Art I, § 8, which provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

To say that Art I, § 9, of the California Constitution is comparable to Art I, § 10, of our Constitution, is tantamount to saying that, with respect to libelous publications, Art I, § 8, and Art I, § 10, of the Oregon Constitution do not address different propositions. This would be patently inaccurate.

[ 233 ]

I find that I must agree with Justices Goodwin and Sloan, dissenting in *Holden,* that adoption of the majority opinion in *Werner* adopts with it "the most extreme view of judicial deference, if not surrender, to legislative supremacy." The *Werner* decision is better described not as judicial deference but as judicial abdication.

Since the *only two cases* which the *Holden* majority declared dispositive of the issue in this case are clearly not in point and their reasoning inapposite, the result reached by the *Holden* court should be overruled.

I deem that the constitutional guarantee of remedy by due course of law, at the least, should provide the defamed person with a judicial hearing on the merits. Only in that way may it be determined whether retraction has in fact been efficacious in making the plaintiff whole rather than merely aggravating the injury suffered as a result of the publication. I cannot accept the legislative judgment that the publisher's option to retract makes every person defamed *by the mass media*[8] whole. When I say I cannot accept it, it is not because I personally disagree with that legislative judgment; rather, I conceive Art I, § 10, as prohibiting the legislature from pronouncing that judgment in a statute.

> "* * * Legislative objectives, however worthy, do not provide a constitutional basis for sacrificing the plaintiff's right to a hearing. It is no answer to say that juries can not be trusted, nor that rascals might profit from the jury system, nor that any significant number of persons who see one television program [or hear one radio program] will probably see [hear] another with its remedial retraction, so there is no harm in denying one a day in court. Due process of law [remedy by due course of law] is not so easily ignored." 228 Or 434.

Neither can I accept the statement in the majority opinion:

---

[8] Should the plaintiff in the case at bar disseminate to other persons libels concerning these defendants, the immunity conferred upon them would in no wise be of avail to him.

[ 234 ]

"* * * As a practical matter, retraction can come nearer to restoring an injured reputation than can money, although neither can completely restore it."

The majority opinion observes that if common law remedies were frozen by the Adoption of Art I, § 10, the legislature would have been helpless to enact a workmen's compensation law. It is true that the enactment of the Workmen's Compensation Law, generally speaking, took from the workman his common law right of action for damages to compensate him for injuries resulting from his employer's negligence. It is to be remembered that the employer could assert three common law defenses in bar; namely, contributory negligence, assumption of risk, and fellow servant. As thus narrowly circumscribed, the injured employe's common law remedy existed more in fancy than in fact. In the case of workmen's compensation, however, the legislature did substitute for the lost common law remedy the guaranteed right of the workman to have all his medical expenses paid and to receive compensation for both temporary and permanent disability and death benefits for his dependents in case of death in lieu of common law general and special damages. These rights under the compensation law are guaranteed to the workman whether his injury is solely the fault of himself, his employer, someone else, any combination of those, or even no one's fault at all. While it is true that a particular workman might receive less money under the compensation law than he would have at common law, the class of injured workmen may well receive, in total, far more money and other benefits than under the common law. Other benefits include such matters as vocational rehabilitation services, compensation for the effect of cumulative injuries, cost-of-living adjustments for those receiving death benefits, etc.

I cannot honestly say how I might have decided the constitutionality of our Oregon workmen's compensation scheme in an attack under Art I, § 10. I do know that I should not have the difficulty I have with the

[ 235 ]

statutes in the case at bar. To liken the substitution of the publisher's option to retract to the substitution of workmen's compensation benefits would require a totally different workmen's compensation scheme. The two situations would be parallel only if a workman who suffered an industrial injury had first to request that his employer furnish benefits provided by the Workmen's Compensation Law. If the employer then had the option to furnish such benefits or be subject to the workman's common law action for damages, the situations would be substantially equivalent. Obviously they are not; therefore, I believe the majority's reference to workmen's compensation is not apposite.

If I have quoted too extensively from Justice Goodwin's dissent in light of my earlier expression that iteration of the *Holden* dissent should not be necessary, since it already appears in the official reports of this court, I trust my brothers and the reader will forgive me. I have not quoted from Justice Sloan but would now do so in bringing this dissent to its conclusion:

> "For it must be remembered that when the legislature abolishes a cause of action to benefit a favored few it must be taken to be because the courts have failed to protect the rights of the few. It is a recognition that the courts have allowed fraud or partiality to warp the course of justice. When the courts sustain the [legislative] act it is a tacit acknowledgment not only of the failure to dispense justice but also an admission that the courts cannot remedy the wrong, if one exists. If the courts sustain legislative negation of established judicial process by applying only the test of a conceivable rational reason for the legislation, then the way is open for the legislature to nullify any form of judicial due process. If judicial due process is worthy of its keep it should not be so readily surrendered." 228 Or 448.

In my opinion, the *Holden* decision and the majority decision here are not consonant with either Art I, § 10,

or Art I, § 8, of the Oregon Constitution, whether those sections be considered separately or together.[9]

I dissent.

Tongue, J., joins in this dissent.

---

[9]I deal not with the majority opinion's reference to the "guest passenger statute," for I consider the constitutionality of that statute better to be appraised at another time and in another case.

I have not overlooked the right of the defamed person to recover his special damages, but I do not believe that right, plus the publisher's option to retract, meet the constitutional measurement of making the injured person whole.