# IN THE OREGON TAX COURT

## SCHOOL DISTRICT NO. 1
*v.*
## MULTNOMAH COUNTY et al
(TC 1762)

Clifford N. Carlsen, Jr., and John F. Neupert, Miller, Nash, Wiener, Hager & Carlsen, Portland, represented plaintiff.

John B. Leahy, Multnomah County Counsel and Rudolph S. Westerband, Assistant Multnomah County Counsel, Portland, represented defendants.

Decision for plaintiff rendered December 16, 1983.

## SAMUEL B. STEWART, Judge.

Plaintiff's first cause of action alleged that defendants failed to turn over property tax payments received on behalf of the plaintiff in a timely fashion during the period from October 15, 1980 to December 31, 1982. The plaintiff alleges that, as a consequence, pursuant to ORS 311.345, defendants are liable to the plaintiff in the sum of either five or ten percent of the amount not timely turned over, with interest at 12 percent per year. Plaintiff's second cause of action alleged that the plaintiff was entitled to the interest earned on investment of the property tax payments received on behalf of the plaintiff and invested by the defendants.

By Interlocutory Partial Summary Judgment Order issued August 8, 1983, plaintiff's motion for partial summary judgment was granted and the defendants were held liable for interest earned on property tax collections held by the defendants pending distribution to the plaintiff with the amount of liability to be determined later.

In resolving plaintiff's first cause of action, the proper interpretation and application of ORS 311.395 must be determined. ORS 311.395(1) requires that "[t]he tax collector, on or before the fifth business day of each month, shall make a statement in triplicate of the exact amounts of cash and of warrants collected during the preceding month for taxes, penalties and interest, and the total amount of the statement shall be credited to the several funds for which they were respectively collected." ORS 311.395(3) requires that "for the period beginning October 15 and ending December 31, the tax collector shall prepare the statements provided by subsection (1) of this section relating to current year tax collections weekly rather than monthly."

Plaintiff contends that "collected," as used in ORS 311.395, is synonymous with "received" (Plaintiff's Post-Trial Brief, at 1) and that ORS 311.395(3) requires the defendant "to distribute on one day each week all current year collections received within the previous five working days. Thus, historically since distributions had been on Fridays, (Tr. 51) each Friday, for example, defendants would be required to distribute current year collections received since Monday of that calendar week." (Plaintiff's Post-Trial Brief, at 5.)

■ To interpret ORS 311.395, it must be noted that the specifics in subsection (1) are not repeated in subsection (3). 2A Sutherland Stat Const § 46.05 (4th ed) states that:

" 'To discover the true construction of any particular clause of a statute, the first thing * * * is the actual language of the clause itself, as introduced by the preamble; second, the words or expressions which obviously are by design omitted * * *.' "

The omission in ORS 311.395(3) refers one back to subsection (1) for guidance. By substituting the word "week" for "month" in subsection (1) the tax collector is ordered, on or before the fifth business day of each week, to make a statement of the exact amounts collected during the preceding week and to credit that amount to the various funds. This interpretation is consistent and harmonious and one which the court adopts.

Defendants concede that if the plaintiff's interpretation of ORS 311.395 defining "collected" as "received" is correct, the defendants did not timely turn over property taxes during the period October 15 to December 31 of each year in question. (Trial Memorandum of Defendant, at 1.) However, the defendants contend that taxes are not "collected" merely upon receipt of money but upon validation by some process to make sure that the payments were taxes and for which year those taxes were collected. (Trial Memorandum of Defendants, at 2.)

Defendants' Exhibit B, offered as support for this allegation, is a letter dated January 12, 1978, from the Senior Assistant Attorney General, Tax Division, Department of Justice, in response to an inquiry regarding ORS 311.395. The letter contains the writer's "informal and unofficial expression of view" that the amounts of property tax payments which the tax collector receives "should be run through the cash register. The amounts which he has received prior thereto but for which he has not made any type of verification as to the purpose of the payment are not in our opinion 'collected.' "

Legislative history reveals that ORS 311.375 through 311.395 were extensively amended in 1963 and again in 1969 to provide for a new method of tax distribution as compared to the method that had been in existence since Oregon became a state. The revision provided that each county should prepare a

percentage tax distribution schedule for each taxing district. The tax distribution percentage schedule would serve as the basis for determining how much of the taxes collected would go to each of the political subdivisions during each period required by ORS 311.395.

Prior to the percentage method of tax distribution, the tax collector had to wait until he had actually posted the tax payment back to the particular property and then determined how much of the taxes in each code area had been collected during a given period of time. The procedure was time-consuming and most counties were unable to distribute taxes to the political subdivisions until late December or mid-January. The change to the percentage distribution method was made to facilitate the distribution of taxes immediately after the money had been collected. (Defendants' Exhibit B.)

Mr. James P. Wilcox, Director, Division of Assessment and Taxation of Multnomah County during the subject years and now Multnomah County Assessor, testified that certain actions were taken in order to enhance the collection and disbursement system. A tape exchange system was instituted in 1978 so that large taxpayers, such as the Department of Veterans Affairs and savings and loan associations, could submit a computer tape listing all accounts for which they were making payment with a check for the total taxes. (Tr 57-58.)

In addition to collections received through the tape exchange system, defendants received tax payments by mail, by over-the-counter transactions, and, in the case of senior citizens' payments and homeowners' property tax relief payments, by checks from the State of Oregon.

At the same time that the tape exchange system was begun, the defendants instituted an optical character reader billing that, when returned by the taxpayer with a payment, could be processed by a computer for application to the property tax years. (Tr 57.) Mr. Wilcox explained that the defendants' policy was to apply tax money received to the oldest year first. A printout would be received listing the amount of money applied to each tax year. He alleged that this was the first point in the system where the break down by tax year of money received and deposited was known. (Tr 64.) The witness stated that, prior to 1977, there was a policy to

estimate the amount of money collected rather than determine the exact amount but since that time no money was distributed "until we knew to which year that amount was to be applied." (Tr 66, lines 11-13.)

In response to cross-examination, Mr. Wilcox testified that the tape exchange program comprised approximately 30 percent of the payments during a given year and that the vast majority of the payments, 90 to 95 percent, were current year collections but admitted that the county had no procedure or policy to process these payments more quickly than any other type of payment. (Tr 112-113.)

It is undisputed that ORS 311.395 was a legislative attempt to improve the speed of distribution of tax collections. Despite this, one significant payment from the state referred to as "the Senior Citizens' payment," approximately $1 million (Tr 149, line 24), admittedly a current year payment, was received by the defendants on or before November 17, 1980, and disbursed on February 19, 1981, over three months later. (Tr 249, line 8.) No processing was necessary.

In addition, Mr. Wilcox stated that no processing was necessary for the property tax payments made by the state, called homeowners' property tax relief payments, approximately $33 million in 1980, because it was "clearly current year's money and is distributable without processing." (Tr 145, line 24-25.) In response to a question as to whether any effort was made to distribute this money as soon as possible, the witness replied "[t]here is no effort made to promote it or to stall it." (Tr 149, line 13.)

Defendants alleged that all other tax payments received required "processing" or "validation" and that a malfunction in the newly instituted computer system contributed greatly to problems regarding "balancing" tax moneys received so that they could be disbursed. Defendants' Exhibit M, a memorandum dated February 24, 1981, received by Mr. Wilcox from Barbara Baker, the county employee responsible for the tape exchange program in the fall of 1980, states:

"In 1979 we began the use of OCR [optical character reader] processing for the majority of mailed-in payments. * * *

"The process broke down in the scanning operation. * * *

[T]he fall of '80, although some better, was still, in my mind, a disaster."

Mr. Wilcox testified regarding the effect of the process breaking down. "If the OCR [optical character reader] does not work, then you can never get the information contained on the remittance advices, the — the pieces of paper you get from the taxpayer. You can never get that information onto the computer so that you will never have the opportunity in the computer to total the collections by year." (Tr 93.)

The validation system employed by the defendants in 1980 resulted in their having received approximately $213 million, 72.8 percent of the levy, by November 30, 1980. By December 11, only $97 million, 33.2 percent, had been distributed to the political subdivisions. (Plaintiff's Exhibit 1.) Despite this fact, defendants contend that "there is no instance in which the county failed to make a distribution within the time allowed by the statute under our interpretation of the statute." (Tr 363, line 25 and Tr 364, lines 1-3.)

■ Webster's Third New International Dictionary, Unabridged, defines "collect" as "to bring together * * * gather * * * to receive." In construing a statute, words of common usage are to be given their natural, plain and obvious meaning. *Blalock v. City of Portland et al,* 206 Or 74, 80, 291 P2d 218 (1955); *Perez v. State Farm Mutual Ins. Co.,* 289 Or 295, 299, 613 P2d 32 (1980).

If "collected" as used in ORS 311.395 is defined as "being received, posted and balanced," each county could devise its own system of checks and balances in a validation process before making any distribution. Under this procedure, ORS 311.395 would be virtually meaningless. Recognizing that ORS 311.395 was enacted in order to speed up distribution of taxes to the various taxing districts, a reading of "collected" as "validated" would allow, even encourage, systems requiring more reconciliation than might reasonably be required which would thwart the legislative objective.

Defendants contend that by employing the word "exact" in the statute, the legislature did not expect the tax collector to make "estimates" of any kind, therefore, they must validate the taxes collected and this cannot be done within the statutory distribution period if the time runs from the date of receiving the tax payments.

Defendants' allegation that ORS 311.395 imposes unreasonable time constraints if "collected" is defined as "received" may have merit but relief must be sought from the legislature. *Schmitt v. Commission,* 1 OTR 25 (1963).

■ Courts may not construe a statute in contravention to common usage of the words employed and the legislative intent expressed thereby. *Kalishman v. Dept. of Rev.,* 8 OTR 440 (1980).

The court finds that defendants should have credited tax payments to the plaintiff on or before the fifth business day of each week of the tax payments received during the preceding week for the subject periods begining October 15 and ending December 31. For the remaining subject periods, defendants should have credited tax payments to the plaintiff on or before the fifth business day of each month of the tax payments received during the preceding month.

The plaintiff urged that either five percent or ten percent damages be assessed against the defendants pursuant to ORS 311.345. Defendants' defense to this claim is their alleged reliance upon an Assistant Attorney General's opinion that taxes were not collected until verified in some manner. (Defendants' Exhibit B.)

Plaintiff alleges that defendants had no basis to rely upon an informal opinion when statutory procedures were available either through ORS 305.105, setting forth a specific procedure for obtaining a declaratory judgment from the Department of Revenue or through ORS 305.110, providing for a construction of the tax and revenue laws by the Department of Revenue.

However, ORS 305.105 provides that "[t]he Department of Revenue may, on petition by any interested person, issue a declaratory ruling with respect to the * * * applicability * * * of any rule or regulation promulgated by it."

The Department has promulgated no rule or regulation with respect to ORS 311.395 despite the mandate of ORS 305.100(1) that the department shall "[m]ake such rules and regulations it deems proper to regulate its own procedure."

■ It is this very lack of a rule or regulation that makes defendants' reliance upon an opinion of an Assistant Attorney General defensible. When specifically asked to interpret the

statute, a Senior Assistant Attorney General expressed the informal opinion that "collected" meant "verified." The department made no change, no comment on this interpretation and, to date, no regulation has been issued by the department regarding this statute. No evidence was presented that the defendants did not rely, in good faith, upon the above interpretation.

Under the circumstances, defendants' reliance on the definition of "collected," as used in ORS 311.395, being interpreted as "verified" makes it inappropriate to impose the penalty and interest assessed by ORS 311.345 unless distribution was untimely made according to the defendants' definition of "collected."

However, state payments for homeowners' property tax relief and for senior citizens required no processing, by admission of James P. Wilcox, Director, Division of Assessment and Taxation of Multnomah County. Therefore, these payments should have been disbursed within the mandatory time schedule provided in ORS 311.395 from the date of *receipt,* since no verification was required and, if they were not timely disbursed, the penalty and interest mandated by ORS 311.345(2) shall be applied.

ORS 311.345(2) states that "[i]f a tax collector withholds the payment of any public moneys collected or received by him after the moneys should be paid and have been demanded, he shall be liable to pay 10 percent damages and 12 percent interest per year from the day payment should have been made by him of the moneys."

The senior citizens' payment was received on or before Monday, November 17, 1980. This week ended on Friday, November 21, 1980. This payment should have been disbursed on or before the fifth business day of the next week. Disbursement was not made until February 19, 1981. Plaintiff's allegation that demands were made to defendants for a timely distribution was unrefuted. Therefore, ORS 311.345(2) dictates that the plaintiff is entitled to damages of 10 percent and 12 percent annual interest.

The homeowners' property tax relief payment of approximately $33 million, received on or before Monday, November 17, 1980, required no processing. This payment was

disbursed on Tuesday, November 25, 1980, within the five-day period of the week following the collection week of November 17-21. Therefore, no damage penalty is indicated.

The plaintiff shall prepare a computation of the damages and interest involved pursuant to the court's determination plus a computation of the defendants' liability for interest earned on property tax collections held by the defendants pending distribution to the plaintiff pursuant to the Interlocutory Partial Summary Judgment Order of August 8, 1983.

The plaintiff alleged it was entitled to attorney fees. (Amended and Supplemental Complaint, paragraph XIII.) Justice Denecke wrote in *Hughes v. Bembry,* 256 Or 172, 177-178, 470 P2d 151 (1970):

> "We have adopted a narrow policy on the allowance of attorney fees and held that they will not be allowed unless expressly authorized by a statute or a contract. * * *"

ORS 305.490 gives the Tax Court authority to award attorney fees in certain situations but the plaintiff does not come within these requirements.

Courts of equity have an inherent power to award attorney fees and have exercised that power in cases of constitutional significance where the plaintiff "brings suit in a representative capacity and succeeds in protecting the rights of others as much as his own." *Deras v. Myers,* 272 Or 47, 66, 535 P2d 541 (1975).

While the conclusion reached in this case may result in benefits to other taxing districts, plaintiff's focus was on its own situation with little or no mention of any benefits inuring to anyone save the plaintiff. The plaintiff made no allegation that it was representing any other taxing district than itself. The present case does not fit within the narrow exception found in *Deras, supra.* Therefore, the court declines to exercise its inherent power to award attorney fees; however, plaintiff is entitled to costs.

The court will withhold its decree in order to permit the plaintiff to submit computations pursuant to the court's determination of the issues. The provisions of Tax Court Rule 67 shall be followed.